## FLANAGAN BANK *v.* GRAHAM.

[71 Pac. 137, 790.]

USELESS PROCEEDINGS NOT ENCOURAGED.

1. The law does not require useless acts to be performed, or indulge mere academic proceedings; thus, where the property covered by a chattel mortgage has been destroyed or so confused with other property as to be incapable of identification, a court will not enter a decree of foreclosure, for it would be useless.

MEANING OF RAILROAD CONSTRUCTION CONTRACT.

2. A contract by which a contractor agreed to build a certain railroad in a substantial manner, "so as to be successfully operated when·built, and to have said road in operation" within a stated time, in consideration of all donations and bonuses pledged to the company and of all its first mortgage bonds, required him to equip the road with engines and cars sufficient for its successful operation.

DELIVERY UNDER RAILROAD CONSTRUCTION CONTRACT.

3. Where a contractor who is required to furnish the engines and cars for a railroad is also its general manager, engines and cars purchased by him in his own name will be deemed delivered to the railroad company when he puts them into use on the road.

CONSTRUCTION OF MORTGAGE ON AFTER-ACQUIRED CHATTELS.

4. A chattel mortgage on property to be thereafter acquired is void in law, but equitably it is regarded as a contract to create a lien according to the agreement as soon as the property is acquired, and, as between the parties and all others having notice or knowledge thereof, takes effect as soon as the property comes into the ownership of the mortgagor.

AFTER-ACQUIRED CHATTELS—LIEN OF BONDS AND MORTGAGES.

5. A contractor who had agreed to construct a railroad and furnish the rolling stock therefor, in consideration, in part, of all its first mortgage bonds, executed a chattel mortgage to a director and general counsel of the railroad company, covering all engines, cars, and materials therefor which he should thereafter acquire. He thereafter purchased, in his own name, engines, cars, and materials, and delivered them to the company, and the vendor, who had no actual knowledge of such chattel mortgage, though it was filed of record, accepted such bonds in payment therefor. *Held,* in a suit to foreclose such chattel mortgage, that the lien thereof was inferior to that of the mortgage given by the railroad company to secure such bonds.

From Coos: JAMES W. HAMILTON, Judge.

This is a suit by the Flanagan & Bennett Bank, a corporation, against R. A. Graham and others to foreclose two chattel mortgages, the first of which was executed by Graham to Flan-

agan & Bennett, as partners, on January 20, 1891, to secure the payment to them of $6,039.54, and such further amount as they should advance to him within sixty days thereafter, not exceeding $10,000 in all, and interest, covering horses, harness, carts, wagons, scrapers, tools, camp outfits, tents, stoves, cooking utensils, and all property and implements used by the said Graham in railroad construction, also all other property for like use that he might thereafter acquire; the other being executed by Graham to Flanagan & Bennett, as partners, on September 14, 1891, as additional security for the debt described in the first, and as security for other sums of money for which the said Graham became indebted to them, and for advances which they might thereafter make to any extent to Graham, and was intended to cover ''all of the railroad cars, car wheels, axles, fastenings, bolts, and all material for the construction of the same, now on the line of the road of the Coos Bay, Roseburg & Eastern Railroad & Navigation Co., and in Coos County, Oregon, and at present being at or in Marshfield, Coos County, Oregon, and Coquille City, in said county, and such other cars, car wheels, and material for construction of rolling stock which may be put on said railroad or in connection therewith. Also any and all rolling stock on said railroad, or which may hereafter be put on said railroad while these presents shall continue in effect, and including locomotives, engines, tenders, and cars of every description.'' The Flanagan & Bennett Bank subsequently succeeded to the interest of Flanagan & Bennett, partners, in these mortgages and the debts which they were given to secure, which indebtedness has since increased to a large amount. The complaint shows that a part of the property so mortgaged has since come into possession of the defendants Beaver Hill Coal Co. and the Coos Bay, Roseburg & Eastern Railroad & Navigation Co., but is held by them subject and subordinate to the lien of plaintiff's mortgages. It is further shown that the defendant the Farmers' Loan & Trust Co. claims to have a lien by way of a trust deed or mortgage upon such property, or a portion thereof, but that the same, whatever it may be, is subsequent and subject to

plaintiff's said mortgages. There is also an allegation that the railroad company, in consideration of the sale and transfer to it of the property described in the chattel mortgages, or a portion thereof, assumed and agreed to pay the said indebtedness of Graham to plaintiff, and a personal decree is demanded for the amount alleged to be due, against both Graham and the railroad company, and the foreclosure of the mortgages is prayed for against all parties defendant. The defendants Beaver Hill Coal Co., the Farmers Loan & Trust Co., Coos Bay Railroad Co., and W. S. Chandler, receiver of the latter, answered, denying nearly all the material allegations of the complaint, but admitting that the locomotives, tenders, rolling stock, and equipments, claimed by plaintiff to be subject to the lien of its mortgages, were acquired by the railroad company, and alleging that they were rightfully acquired through various persons and at various times, but denying that the same, or any portion thereof, are subject to such pretended mortgages, or that the said railroad company assumed or agreed to pay any part of said pretended indebtedness of Graham to the plaintiff. It is further alleged that the trust company has acquired a lien upon all of such property, superior to any of the pretended equities of the plaintiff. The decree of the trial court was in favor of the defendants, dismissing the complaint, and plaintiff appeals.    MODIFIED.

For appellant there was an oral argument by *Mr. Wirt Minor*, with a brief over the names of *Cotton, Teal & Minor* and *Joseph W. Bennett*, to this effect:

I. The lien of the plaintiff's mortgages attach to all the property which was in the possession and under the control of Graham as the apparent owner: Jones, Ch. Mtgs., §§ 141, 143, 156, 170-174; *Holroyd* v. *Marshall*, 10 H. L. Cas. 191; *Mitchell* v. *Winslow*, 2 Story, 630-644; *Butt* v. *Ellett* 86 U. S. (19 Wall.) 544; *Gregg* v. *Sanford*, 24 Ill. 17 (76 Am. Dec. 719); *Schargenburg* v. *Bishop*, 35 Iowa, 60; *Cigar Co.* v. *Foster*, 36 Mich. 368; *Sellers* v. *Lester*, 48 Miss. 541; *Merrill* v. *Noyes*, 56 Me. 458 (96 Am. Dec. 486).

II. A mortgage upon property to come into the possession of an individual who gives the mortgage, but which property is not *in esse* at the time the mortgage is given, nevertheless operates as a lien upon such property where such mortgage is properly on file: *Beall* v. *White,* 94 U. S. 382; *National S. & L. Bank* v. *Small,* 7 Fed. 837; *Apperson* v. *Moore,* 30 Ark. 56 (21 Am. Rep. 170); *Williamson* v. *Railroad Co.* 29 N. J. Eq. 311; *Seymour* v. *Railroad Co.* 25 Barb. 284; *Butler* v. *Rahm,* 46 Md. 541; *Brett* v. *Carter,* 2 Lowell, 458; *McCaffrey* v. *Woodin,* 65 N. Y. 459 (22 Am. Rep. 644); *Smithrust* v. *Edmunds,* 14 N. J. Eq. 408; *Floyd* v. *Morrow,* 26 Ala. 353; *Gay* v. *Bidwell,* 7 Mich. 519; *Cook* v. *Corthell,* 11 R. I. 482 (23 Am. Rep. 518); *Wright* v. *Birchal,* 72 Mo. 179 (37 Am. Rep. 433).

III. The ownership of all of the stock and bonds of the Coos Bay, Roseburg & Eastern Railroad & Navigation Co. did not constitute Graham the corporation in the sense that such ownership vested in him the control of the corporate property or the management of the corporate business: *Pullman Car Co.* v. *Missouri Pac. Co.* 115 U. S. 596-597 (6 Sup. Ct. 194). The railroad company knew because of Graham's connection with it of Graham's purchases of the property covered by plaintiff's mortgages, and such notice as it derived through Graham was sufficient notice that the property claimed to have been acquired by it was covered by plaintiff's mortgages: Wade, Notice, §§ 6, 11, 27, 33, 65, 77, 95, 681-687, 690; *Hart* v. *Bank,* 33 Vt. 252, 270; *Gregg* v. *Sanford,* 24 Ill. 17 (76 Am. Dec. 719); Jones, Ch. Mtgs. § 295.

For respondents there was an oral argument by *Mr. J. Couch Flanders,* with a brief over the name of *Williams, Wood & Linthicum* and *Cake & Cake,* to this effect:

I. All the rolling stock was and is the property of the railroad company and not of Graham. The latter's contract with the company required him to construct the road "so as to be successfully operated when built," and to "have said railroad in operation within the time limited by said subscriptions and subsidies, or within such further time as shall hereafter, by

resolution of said board of directors, be determined upon.'' This required Graham to equip the road, and all parties so construed it, as appears by their correspondence and actions.

II. Should Graham be found to have taken title to any of the rolling stock, such title was taken by him as trustee for the corporation, and all such property was subject to the lien of the mortgage then executed and delivered by the corporation to the Farmers' Loan & Trust Co.; and the equities of said Farmers' Loan & Trust Co. and of the holders of the bonds secured by said mortgage are superior to any equities in favor of appellant. These equities are fixed by the date when the mortgage was executed and delivered, viz., June 1, 1891, prior to the date of the second mortgage to the appellant: Jones, R. Sec. § 210; *Neilson v. Iowa Eastern R. Co.* (8 Am. Ry. Rep. 82-88).

III. The mortgage to Flanagan & Bennett on rolling stock not then in existence on the railroad is equitably merely a personally binding contract by the mortgagor to give a further mortgage. The rights of third parties having intervened, however, and the property not having come into the hands of the mortgagee, and having, prior to the institution of this suit, passed out of the hands of the mortgagor, the only remedy of the mortgagee is an action as a general creditor to recover damages for the breach of the contract for a further lien: *Otis v. Sill,* 8 Barb. 103; *Beebe v. Richmond Light Co.* 35 N. Y. Supp. 1; *Rochester Distilling Co. v. Rasey,* 142 N. Y. 570 (40 Am. St. Rep. 635, 37 N. E. 632); *Cameron v. Marvin,* 26 Kan. 628; *Comstock v. Scales,* 7 Wis. 159; *Moody v. Wright,* 13 Metc. (Mass.) 17 (46 Am. Dec. 706, note); *Ross v. Wilson,* 7 Bush (Ky.), 29; *Hunter v. Bosworth,* 43 Wis. 583.

IV. The only exception to the rule above set forth relates to mortgages executed by railroad corporations to a trustee to secure bondholders, as to which it has been held that such a mortgage creates a valid lien upon rolling stock subsequently acquired. This exception is based largely upon principles of public policy, having in view the perishable nature of rolling stock; the courts holding that unless such future acquisitions

can be mortgaged, as incident and essential to the use of the railroad itself, the security is likely to be greatly diminished: *Pennock v. Coe,* 64 U. S. (23 How.) 117; *Morrow* v. *Noyes,* 56 Maine, 458 (96 Am. Dec. 486). Such considerations have no weight with reference to the appellant's mortgage. Appellant was not a bondholder of the road whose time of repayment extended over a term of years.

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

The legal issues presented are few, although the record is voluminous, and incumbered with a vast variety of exhibits, more or less confusing, and difficult to reconcile so as to arrive at an entirely satisfactory solution of the controversy.

1. As to the chattel mortgage first given by Graham to Flanagan & Bennett, the property involved, unless the steam excavator may be said to be included, has ceased to have any practical existence, or at least it has not been presently so identified as to make it possible that the law may lay hold of it and subject it to the payment of plaintiff's demands. Many of the horses have died, and such as remain have not been traced to any definite possession, and the wagons, carts, scrapers, tools and implements, camp equipments, and other property then owned and used by Graham in his construction work, have become worn out and so scattered and dissipated that it is not practicable to locate any part of them, or to determine within whose possession any considerable portion thereof is to be found; so that it is impracticable for the court to make legal application of them to the discharge of any alleged incumbrance. To suffice for this conclusion, we advert to the testimony of Mr. Bennett. He says: "I suppose the horses are dead; if any of them are living, I do not know it. The harness,—there may be some of that in existence, but I do not know. The thirty wagons and fifty-two carts,—I could not say about them, whether any of them are in existence or not; they were scattered along the line of the railroad of the Coos Bay & Eastern Railroad & Navigation Co. The fifty slush

scrapers, I understand, are some of them scattered along the railroad; the last I saw of them was up near Myrtle Point, or close to the track of the railroad, but a great many of them, I believe, were used in building the Klondike spur, and I think they had a great many of these wheel carts and slush scrapers, but I could not say how many, and the tools, camping outfit, and cooking utensils, I suppose a great many of them are worn out. What amount of it is left I could not say, but I think whatever is left is along the line of the railroad, somewhere, and I suppose Mr. Chandler has possession of it, although I do not know that. The pile driver and hammer, scow, engines, ropes and blocks, tackle, etc., I do not know when I saw that last, and I could not say where it is.'' Mr. Chandler, who is now receiver of the road, testified that none of this property has come into his possession. He has the steam excavator, but none of the property described generally by the mortgage; neither has the Beaver Hill Coal Co. possession of any of it. True, the pleadings would seem to admit on the part of the railroad company and the Beaver Hill Coal Co. that the property had come into their possession, but if it is there now it is impossible of identification, and it would be a useless and vain proceeding to decree a foreclosure upon property having no practical present existence. Hence we conclude that plaintiff is not entitled to a foreclosure as to this property, and we do not understand that it is now seriously insisted upon by its counsel. This mortgage contains the following clause, namely: ''Also including herein any and all property which said Graham may hereafter acquire for use in connection with the above, or which may be an enlargement or addition thereto;'' and it is insisted that this is suitable and adequate to constitute the mortgage a lien upon the steam excavator, which was purchased by Graham through J. D. Spreckels & Bros. Co. on January 16, 1893, and subsequently employed along the line of the road. But, considering the general nature of the property described, it does not seem to us by reasonable construction and intendment that this machine was to be included. This disposes of the first mortgage.

To determine the potency and validity of the second mort-gage as a lien upon the property therein described, both as to the property then in existence and such as was thereafter to be acquired, involves an inquiry into the history of the organization of the railroad company, its control and management, and Graham's business relations thereto, as well as the manner in which the alleged rights of the relative parties concerned were acquired. The original incorporators of the railroad company were J. W. Bennett, E. G. Flanagan, T. R. Sheridan, and A. M. Crawford, and the first board of directors was composed of T. R. Sheridan, R. A. Graham, F. W. Burnett, O. J. Seeley, W. B. King, E. G. Flanagan, and W. E. Baines, the first meeting being held August 19, 1890. T. R. Sheridan was elected president, F. W. Burnett vice president, and W. E. Baines secretary and treasurer. R. A. Graham was elected general manager, and as such was "to have the general management of the business of the company." F. W. Burnett was elected general solicitor, chargeable with the duty of acting as its counsel. On this date the company, being duly authorized thereto, made and entered into a contract with Graham, which, with its preamble, reads as follows:

"*Whereas*, the said corporation has been organized for the purpose, among others, of building and operating a line of railroad from a point on Coos Bay, at the Town of Marshfield, in the State of Oregon, running thence to a point at the City of Roseburg in said state; and

"*Whereas*, the said corporation is at present wholly without means of constructing such railway line; and

"*Whereas*, certain subscriptions, subsidies, and guaranties have been made by individuals and corporations in favor of the party of the first part, on condition that said railway line be completed and in operation within a limited time, which subsidies amount in the aggregate to about $225,000; and

"*Whereas*, the said corporation also has powers under its charter and the laws of the state to issue its bonds to the amount of $25,000 per mile of said proposed road, to be secured by a mortgage upon all its property now owned or to be acquired; and

"*Whereas*, said R. A. Graham, party of the second part, proposes to undertake the construction of said road from

Marshfield to Roseburg, in consideration of receiving from said party of the first part an assignment of all said subsidies, subscriptions, and guaranties (except rights of way and terminal facilities), and also the bonds of the same so secured as aforesaid to the amount of $25,000 per mile of said road, as the same shall be located and constructed between said points: * *

"Now, THEREFORE, THIS MEMORANDUM WITNESSETH, that, in consideration of the agreement of the said party of the second part to undertake the construction of said line of railroad between the points hereinbefore named, said railroad to be a standard gauge, and be built in a substantial and proper manner so as to be successfully operated when built, and to have said railroad in operation within the time limited by said subscriptions and subsidies, or within such further time as shall hereafter, by resolution of said board of directors, be determined upon, the party of the first part hereby agrees: *First,* to cause to be assigned to said R. A. Graham or his assigns all subscriptions, subsidies, and guaranties made to said party of the first part, as an inducement for the building of said road; and, *second,* to cause to be issued and delivered to said Graham or his assigns the first mortgage, thirty years, 6 per cent gold bonds of the party of the first part to the amount of $25,000 per mile of said proposed road between Marshfield and Roseburg, as the same shall be located and constructed, and to secure said bonds by a mortgage or trust deed upon said line of railway, and all property of said corporation now held or hereafter acquired in manner and form satisfactory to said Graham or his assigns."

The board, at a meeting held April 28, 1891, adopted a form of bond and mortgage which had theretofore been submitted to and approved by the Farmers' Loan & Trust Co., and the president and secretary were authorized and empowered to sign and execute them in behalf of the company. At this meeting, F. W. Burnett resigned as director, vice president, and general solicitor, and J. W. Bennett was elected director and vice president in his stead. Bennett qualified as director May 1, 1891. He was again elected director September 12, 1891, and qualified on the 14th, at which date he was re-elected vice president. It is also shown that Bennett acted as general solicitor or counsel for the company from the time of his first election as director and for several years thereafter. On June 1, 1891, it

was reported to a meeting of the board of directors, Bennett being present, that the Farmers' Loan & Trust Co. objected slightly to the form of the mortgage theretofore executed, and desired to have certain words stricken out; whereupon the board directed that another mortgage be executed to conform to its behests, "in such form, and with such provisions, as may be acceptable to the said trust company, and designed to convey all the property of this corporation, now owned or hereafter acquired, as security for its bonds." Pursuant to this authority, the company duly executed and delivered to the trust company a mortgage or deed of trust, embracing property as follows: "All locomotives, engines, tenders, cars, carriages, tools, machinery, manufactured or unmanufactured materials, coal, wood, and supplies of every kind belonging or appertaining to the railroad company; and, also, all line or lines of telegraph, telegraph offices, stations, implements and materials, and all property, real or personal, rights, privileges, and franchises, incidents, appendants, and appurtenances thereunto belonging, whether now held or hereafter acquired." There is some dispute as to when this mortgage was executed, the defendants contending that it was on June 1, 1891, and the plaintiff that it was not until October, and that it was not filed for record until December 1, 1891. This inquiry, however, we do not deem especially important to the present controversy. The bonds for the first section of five miles of the road constructed were issued by authority of the board of directors on January 9, 1892; for the second section on May 12, 1892; the third, on August 8, 1893; and for the fourth and fifth, October 28, 1893. Those for the first two sections were delivered by the trust company to Graham, and for the last three to J. D. Spreckels & Bros. Co., in pursuance of Graham's instructions. The capital stock of the railroad company consists of 40,000 shares, at $100 per share, and there were issued 19,994 shares to O. J. Seeley, in trust for R. A. Graham, and six shares to such persons as it was desired to have serve as directors of the company. These were canceled and reissued to others as occasion demanded in changing the

personnel of the directorship, so that Mr. Graham was constituted the owner and holder of practically all the subscribed capital stock of the concern, the manager of the company, and a contractor to build and construct the road under the agreement of August 19, 1890, by virtue of which he was to become the owner of all the subsidies, except the right of way guaranties, and all the bonds of the company as fast as they were issued, and of these conditions all of the directors acting at the time must necessarily have been cognizant.

On October 15, 1890, Spreckels Bros. & Co. advised Graham that it had purchased on his account thirty miles of 45-pound steel T-rails, and necessary fish plates, bolts, etc.,—payments to be made, $50,000 cash on receipt of property in San Francisco, and the balance in ninety days after final delivery, with interest at 7 per cent. Graham confirmed this purchase, but when the rails arrived in San Francisco he was unable to pay for them, and all but ten miles were sold, with his consent. Spreckels Bros. & Co., however, would not let him have the balance until he gave security for payment. This was accomplished about August 24, 1891, by an arrangement whereby Graham executed his two notes, with Collins of the First National Bank of San Diego as surety, payable, one in four and the other in six months, and agreed to give Spreckels Bros. & Co. the bonds, and a majority of the stock of the railroad company, and the subsidies, as security additional to Collins' indorsement. This arrangement was confirmed by subsequent correspondence of the parties. On February 24th, Spreckels Bros. & Co. wrote to Graham, advising him that his second note of $17,000 was then due, and requesting him to forward securities at once, otherwise it must insist upon payment, and, on the 27th, Graham answered, saying, "I beg to state that the delay in not delivering you the securities which were promised must have been very aggravating," and explaining that it was caused by the bank note company's not having them ready. He further wrote that the first section of five miles had been accepted by the company, and the bonds ordered by the trustees, and that the board would have another meeting "early

next month, and will accept the next section, and the bonds will be issued on that." On March 23, 1892, Graham delivered forty-eight of the bonds, being Nos. 1 to 48, inclusive, of the first issue. On September 3, 1892, Spreckels Bros. & Co. loaned to Graham an additional $10,000, and took his note therefor, with a written pledge on the face of it of forty-seven additional bonds, being Nos. 79 to 125, inclusive, as security for its payment, and on that day another agreement was entered into, reciting in substance that, in consideration of certain advances made by Spreckels Bros. & Co. to enable Graham to pursue the construction of the railroad from Marshfield to Myrtle Point, as per his contract with said road, Graham is to deposit with Spreckels Bros. & Co. all the bonds of said railroad issued and to be issued, from No. 1 to No. 663, inclusive, also a majority of the capital stock, as security for advances made, with interest at 7 per cent, to be charged on entire account, and 5 per cent bonus on advances made on and after September 3, 1892. It was further agreed that Spreckels Bros. & Co. should receive 10 per cent commission for any sales of bonds negotiated by it, and also 10 per cent on amount of profit in the cost of construction of the road from Myrtle Point to Roseburg. On September 13, 1893, this agreement was modified so as to entitle Spreckels Bros. & Co. to 6 per cent only on the proceeds of sales of bonds, and at the same time Graham gave it an option of purchasing the railroad stock at 20 cents per share.

All the bonds issued, being 625 in number, went into the hands of Spreckels Bros. & Co. under these arrangements save five, and 10,001 shares of the capital stock and certain subsidies. Outside of these securities, Graham had no credit whatever with Spreckels Bros. & Co., and it dealt with him in reliance wholly on the securities. In its dealings with Graham, and the advancement of funds to him, Spreckels Bros. & Co. kept its account with him individually, and not as manager of the railroad, or with the railroad itself. Mr. Samuels, who was the manager of Spreckels Bros. & Co., testified, however, that it was his understanding that the advances were made for

the purpose of building and equipping the road to Myrtle Point; that in reality Spreckels Bros. & Co. was dealing with Graham as manager of the road, and not with him in his individual capacity, and that the purchases of rolling stock were made in behalf of the railroad company; that, when rolling stock was purchased and placed on the road, it immediately became the property of the company, and a part of the assets thereof, as represented by the bonds. After the road was completed to Myrtle Point, Spreckels Bros. & Co. made other advances to apply on the payroll for the operating expenses of the railway. Large advances were made by Spreckels Bros. & Co. to Graham under these several agreements, and for betterments and operating expenses, until on Novembr 1, 1897, they amounted in the aggregate to $523,162.52, for which Graham gave his note, pledging anew the 10,001 shares of the capital stock, all of the bonds then issued, from No. 1 to No. 625, inclusive, except five, and certain real property, being subsidies acquired by Graham under his contract to construct the road, and authorized Spreckels Bros. & Co., in case the note was not paid when due, to dispose of said property and apply the proceeds in payment thereof. Subsequently, a suit was instituted in the Superior Court of the City and County of San Francisco, State of California, by Spreckels Bros. & Co. against Graham, to foreclose its lien upon the property thus pledged, resulting in an agreement between the parties, which in the end culminated in Spreckels Bros. & Co. becoming the owner of all of said property, and it has since continued in such ownership.

Now, as to the acquirement of the property, which it is insisted is covered by the second mortgage of Flanagan & Bennett Bank, or the one executed September 14, 1891: Locomotive No. 1 was purchased July 15, 1891, by Graham of the New York Equipment Co., under an agreement conditioned that the title should remain in the equipment company until payments were made in accordance with the stipulations therefor, being a cash payment of $1 000, and $500 at the end of each month thereafter for four months, making the last to fall

due November 15, 1891. The locomotive was originally purchased for the Southern California Railroad Co., and was to be delivered at San Diego on its tracks. Subsequently, however, in October, 1891, it was delivered at Coos Bay, and, by indorsement on the contract of date, April 16, 1892, Graham assigned and transferred his interest therein, and to the property described, to the Coos Bay Railroad Co. He purchased of the Risdon Iron Works, along in March and April, 1891, the ironwork complete, togther with hardwood brake beams, for thirty cars, which were delivered at Coos Bay some time in April. The remaining woodw. rk of these cars was subsequently supplied at the railroad company's shops. The cars were constructed with such material, and have since been in use on the road in its operation. Ironwork for twenty coal cars was obtained about January 18, 1895. Locomotive No. 2 arrived at Coos Bay February 5, 1893, the steam excavator or shovel February 19, 1893, and the coach was purchased in January, 1893. This is as far as we can accurately trace the acquirement of this species of property by Graham, and is sufficient for our present purpose. Generally speaking, this property was paid for through advances made by Spreckels Bros. & Co. at the instance of Graham, under their several agreements hereinbefore noted. All of such property in its present condition may be denominated "rolling stock," and that which is in dispute here may be scheduled as follows: 2 locomotives, 26 flat cars, 4 box cars, 12 logging trucks, 3 hand cars, 3 push cars, 1 coach, 2 cabooses, and 20 coal cars; and there is, in addition to this last, 1 steam excavator. This property, since its existence, has been assessed to the railroad company generally, and the company has been using it in the operation of its road, under the supervision of R. A. Graham as manager, and, generally, we may say that it has been treated by the parties concerned as belonging to the railroad company. We are now to determine the relative rights of the railroad company, the trust company, and the Flanagan & Bennett Bank.

2. We think Graham's construction contract with the rail-

road company made it obligatory upon him to equip the road, that is, to furnish rolling stock, along with the construction of the roadbed, laying the rails, etc. In a resolution premising the execution of the contract on the part of the railroad company, it was declared that the immediate purpose of the organization was to construct and operate a standard-gauge railroad, which the contract requires Graham to build in a substantial and proper manner, ''so as to be successfully operated when built, and to have said road in operation'' within the time stated. Graham has himself placed this construction upon his undertaking, and it has been treated in that light by the parties concerned; so that we are impelled to such an interpretation at the present time. In the natural way of thinking, and the one that the course of events would suggest, it would seem that Graham by his purchases became the owner of the rolling stock prior to any acquirement of title by the railroad company. The purchases were made with funds secured by the pledging of property that he was entitled to under his contract of construction, and the title to the property purchased first rested in him. Beyond this, however, the railroad company was entitled to have the property turned over to it unincumbered, as it added value to the railroad and offered security for the payment of the bonds, the value of which depended thereon, along with the roadbed and other appurtenances.

3. The property became the company's, at least as soon as any part of the road was accepted and it was employed in its operation. There was no especial delivery by Graham to the company of any part of it, unless it may be said that locomotive No. 1 was so delivered by the assignment of the contract of purchase on April 16, 1892; but from the relations of the parties, Graham being both contractor for construction and manager of the road, fair dealing would seem to suggest that there was a delivery by him as contractor to the company of which he was manager as soon as the property was put to the use upon the company's road for which it was purchased and designed.

4. The general principle governing a mortgage intended to cover property not in existence or after-acquired seems to be that in law it is ineffectual and void, but in equity it is regarded as an executory agreement, which, if ineffectual *per se* to transfer the present legal title, operates to impress a lien according to the agreement of the parties, when the property is eventually brought into existence, and may be said to be acquired under the familiar maxim that ''Equity considers done that which ought to be done.'' The instrument called a ''mortgage,'' under such conditions, is construed as operating by way of a present contract to give a lien, which, as between the parties and all others having notice or knowledge thereof, takes effect or attaches to the subject as soon as it comes into the ownership of the mortgaging party: Jones, Ch. Mtgs. (4 ed.) § 170; *Holroyd* v. *Marshall*, 10 H. L. Cas. 191; *Mitchell* v. *Winslow*, 2 Story, 630 (Fed. Cas. No. 9,673); *France* v. *Thomas*, 86 Mo. 80; *Beall* v. *White*, 94 U. S.. 382; *Kribbs* v. *Alford*, 120 N. Y. 519 (24 N. E. 811); *Ludlum* v. *Rothschild*, 41 Minn. 218 (43 N. W. 137); *Cameron & Co.* v. *Marvin*, 26 Kan. 612; *Dodge* v. *Smith*, 5 Kan. App. 742 (46 Pac. 990).

5. At the time of the execution of plaintiff's second mortgage, none of the property described and intended to be included was in existence as it is in its present form. The iron, including car wheels, and the hardwood brakes sufficient and necessary for the construction of thirty freight cars, were then in the possession of Graham on the line of the railroad; but these materials have long since been built into cars, and have gone into the possession of the railroad company and become its property. This material was so manufactured into cars, presumably with the consent of Flanagan & Bennett and the bank, as they were purchased for that purpose, and so manufactured, in pursuance of the objects and purposes of the incorporation; so that, in effect, all of this property must be deemed as after-acquired, and should be so treated. Now, the situation is that Bennett, who was a copartner in the firm of Flanagan & Bennett at the time this mortgage was taken by the firm, was instrumental, as a director of the railroad com-

pany, in having the mortgage or trust deed to the trust company executed, and must have had full and ample notice and knowledge of the purposes for which it was executed, and that the rolling stock added value to the bonds to be secured thereby. Whether this instrument was prior in time of its execution to Flanagan & Bennett's mortgage of September 14, 1891, is of little moment, as Bennett assuredly knew at the time of the execution of the latter mortgage that the railroad company was to place a lien upon the property, in part security for the payment of its bonds, unincumbered by any other claim of lien whatever. He was also apprised of the fact that Graham was to come into the ownership of these securities, and that they were to play an important part in enabling him to construct the road and equip it under his contract with the company. In this light it would be inequitable for his firm to take a mortgage subsequently and enforce it against the bondholders. Spreckels Bros. & Co. had no actual notice of plaintiff's mortgage. It was, perhaps, charged with constructive notice, the mortgage having been placed on file as required by law, but this does not change the result, as the bondholders have a superior equity in any event.

There is another feature of the case that militates somewhat against the plaintiff, which is, that in 1896 Mr. Bennett took the mortgage off the files, supposing that Graham was solvent and amply able to pay, and that he would pay the obligations which the mortgage was given to secure in due time, and thereafter the notes were renewed; so that the conduct of the parties was not altogether consistent with a continuous claim of lien under the chattel mortgage. It is argued that Flanagan & Bennett having secured their mortgage from Graham prior to his transfer of the property to the railroad company, the company could mortgage only what interest it had, and, necessarily, the trust company's mortgage would be subordinated to theirs. This would be so, ordinarily, but the rule can have no application here, as Bennett, being a member of the firm of Flanagan & Bennett, was largely instrumental in securing the execution of the mortgage by the railroad company to

the trust company for the sole benefit of the bondholders, and, the mortgage being resolved upon long prior to the execution of the Flanagan & Bennett mortgage, the latter firm could not be permitted to thus impair the security of such bondholders. As against the railroad company, the plaintiff's equities suffice for an enforcement of the liens, but not as against the bondholders. The allegation that the railroad company assumed to pay Flanagan & Bennett's claims against Graham is not proven.

The decree of this court will therefore be that plaintiff have a foreclosure of its mortgage of September 14, 1891, without a personal decree against the railroad company, but that it be subordinate and subject to the mortgage or trust deed of the defendant the Farmers' Loan & Trust Co. The decree of the court below will therefore be modified accordingly.

MODIFIED.

Decided 16 March, 1903.

ON PETITION FOR REHEARING.

MR. JUSTICE WOLVERTON delivered the opinion.

In the petition for a rehearing of this cause counsel for plaintiff and appellant controverts the statement contained in the opinion rendered, to the effect that at the argument of the cause a foreclosure of plaintiff's first mortgage was not seriously insisted upon. We may have been erroneously impressed by what was said, or possibly by what was left unsaid. But, however that may be, the finding of the court is altogether tenable within the record, and is decisive of the particular issue, namely, that there was not sufficient identification of the property to enable the court to lay hold of it by apt designation and description, and to decree a foreclosure and its consequent sale. We adverted to the testimony of Mr. Bennett, one of the proprietors of the plaintiff bank, on this subject, and there is no need of further reference to it now. And in that connection we observed that Chandler "testified that none of this property has come into his possession." We

now quote his exact language, that there may be no misapprehension: ''Q. 77. Did you see at that time any of the property mentioned in the first chattel mortgage from Graham to Flanagan & Bennett? A. No, sir. Q. 78. Do you know if there is any of that property that is contained in the property turned over to the Beaver Hill Coal Co.? A. There may be one or two carts, and also a lot of these old plugs that were here. Q. 79. If you have any of that property which is described in that mortgage, which is still in your possession, I wish you would make a list of that for me. A. I do not believe I have any of it to make a list of it. Q. 80. You do not? A. No, sir.'' This testimony was taken in September, 1900, and shows that the receiver of the railroad company then in office did not have any of such property that he was able to designate. True, a list of tools, as it is termed, was offered in evidence, and marked plaintiff's ''Exhibit 1,'' among which were designated: ''Grading wheel scrapers, 33; grading slush scrapers, 33; grading carts, 23; wagon poles, 14; cart shafts, 2; plows, 3; wagon, 1; wagon wheels, 34; wagon axles, 14; ironwork for swing pile driver; anchor, 65 pounds; anchor, 80 pounds;'' but as to how this list was made up, and when, and whether any of this property was in the possession of Chandler at the time, was not shown. Indeed, the above reference to Chandler's testimony indicates unmistakably that he did not have any of it, nor could he then make a list of it; so that it was not susceptible of such identification and designation that the court could decree a foreclosure concerning it.

The insistence by the petition for a rehearing that plaintiff was entitled to a personal decree against Graham for the amount of its demands is answered by the fact that such was the actual decree of the court, and it was so entered of record at the time. The other points made are fully discussed in the main opinion.                               REHEARING DENIED.