## Irwin's Bank et al. *v.* Fletcher Savings and Trust Company, Receiver, et al.

[No. 24,017. Filed December 17, 1924. Rehearing denied March 10, 1925.]

1. RECEIVERS.—*Property in Possession of.—Rights of Creditors.*—A receiver for an insolvent, appointed for the purpose of winding up its affairs, takes the property of the insolvent impressed with the then legal or equitable rights of creditors. p. 677.

2. RECEIVERS.—*Rights of Creditors.—Preference.—Validity.*—In determining the respective rights of creditors of an insolvent whose property has been placed in the hands of a receiver, assignee or trustee, a preference of one creditor over others may be good between the creditor and debtor but not good as to other creditors unless perfected as required by law. p. 677.

3. RECEIVERS.—*Rights of Creditors.—How and When Determined.*—A controversy between creditors of an insolvent, whose property has been placed in the hands of a receiver for the purpose of winding up its affairs, as to their rights on distribution is determined judicially as of the date of the appointment of the receiver. p. 677.

4. RECEIVERS.—*Rights of Creditors.—Unauthorized Deductions from Claims.*—A creditor who had discounted notes for an insolvent for whose property a receiver was appointed was entitled to the full amount collected in the notes so discounted, without any deduction for commissions to agents for the sale of machines for which the notes were given or for discounts on notes paid before maturity. p. 678.

5. RECEIVERS.—*Rights of Creditors.—Unauthorized Deductions from Claims.—Payment from Other Funds.*—On the distribution among creditors of the money collected by a receiver of an insolvent, where the receiver had wrongfully made certain deductions from the amount due a claimant from collections on notes discounted by the claimant, money collected by the receiver on other notes owned by the insolvent when the receiver was appointed should be applied to the payment of the amount of the improper deductions. p. 679.

6. RECEIVERS.—*Rights of Creditors.—Liens of Creditors on Funds of Receivership.*—An investment company which had discounted notes given to an insolvent corporation for machines manufactured and sold by it, under a contract which specifically described the class of notes to be discounted, but which

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

contract was superseded by a verbal contract that certain advancements made by the investment company should be repaid from the proceeds of all subsequent notes "covered by the terms" of the original contract, whether assigned or unassigned, upon the appointment of a receiver for the insolvent's property, was entitled to an equitable lien on the proceeds of all such unassigned notes' passing into the receiver's hands from the insolvent, but, in order to be enforceable, there must have been evidence as to the aggregate amount of the notes that were pledged to the investment company. p. 684.

7. RECEIVERS.—*Rights of Creditors.—Equitable Lien of.—Establishment.*—In order to establish an equitable lien on funds in the hands of a trustee for the benefit of certain classes of creditors, another creditor claiming that such fund was created for the purpose of securing his claim must be able to establish such intention by clear and unmistakable evidence, completely eliminating vagueness or uncertainty as to the terms or substance of the agreement, and making such agreement enforceable without any affirmative action on the part of the debtor. p. 691.

8. RECEIVERS.—*Rights of Creditors.—Equitable Lien of Materialmen.—Priority as to Indorsers.*—A contract between a manufacturing company and indorsers of its notes, creating a special fund to be controlled by the two, to enable the former to carry out a contract with the government to manufacture war munitions and, at the same time, secure the indorsers, *held* not to give materialmen furnishing supplies to be used in such manufacture a lien on such fund superior to the indorsers, although the contract gave the indorsers' consent to the payment of material bills. p. 691.

9. CONTRACTS.—*For Benefit of Third Person.—Evidence to Establish.*—A contract may be made for the benefit of a third person not mentioned therein, but the intention to do so must be clearly manifested. p. 692.

10. CONTRACTS.— *Construction.— Preliminary Recitals.*— While preliminary recitals in a contract may be persuasive in determining the intention of the parties thereto when the language expressing their contractual relations is ambiguous, uncertain or indefinite, they should not be allowed to control clearly expressed stipulations therein. p. 694.

11. CONTRACTS.—*Recitals Therein.—Effect of.—Limited to Parties.*—The effect of recitals in a contract is limited to the parties thereto. p. 694.

12. ASSIGNMENTS.—*Property Assignable.—Interest in Joint Fund.—Consent of Other Parties.—When Necessary.*—One of the parties to a contract creating a joint fund for the benefit

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

of numerous parties may assign his interest therein without the consent of the other parties thereto, where there is nothing in the contract prohibiting such assignment.  p. 695.

13.  CHATTEL MORTGAGES.—*Recording.*—*Effect of.*—The proper and timely recording of a mortgage constitutes constructive notice to all persons claiming under the mortgagor.  p. 696.

14.  CHATTEL MORTGAGES. — *Property Mortgaged.* — *After-Acquired Property.*—*Special Fund for Special Purpose.*—A special fund consisting of money loaned by the government to a manufacturing company to enable it to perform its contract with the government to manufacture certain war munitions, together with all moneys received from the munitions contract, created and set aside for specific uses by a contract between the company and the indorsers on its notes for the loans, *held* not within a clause in a prior mortgage making all after-acquired property subject to the mortgage where the fund was insufficient to pay all the expenses of the munitions contract and the stipulated commissions to the indorsers, there being no profit or surplus remaining for the mortgagor to which the mortgage could attach.  p. 696.

15.  CHATTEL MORTGAGES.—*Validity.*—*Possession and Use of Mortgaged Property by Mortgagor.*—The fact that a mortgage by a manufacturing company contemplates that possession of the mortgaged property shall be retained by the mortgagor, with the privilege of using and selling the same in its business, does not invalidate the mortgage where there is no evidence of a secret trust for the benefit of the mortgagor or of fraudulent intent, or of a diversion of the funds of the company to matters outside of its regular business, and, in any event, such fact would not render the mortgage void, but the question of its invalidity would be one of fact for the court or jury (*New* v. *Sailors,* 114 Ind. 407 and *Stout* v. *Price,* 24 Ind. App. 360, distinguished).  p. 697.

16.  CHATTEL MORTGAGES.—*Validity.*—*Possession and Use of Mortgaged Property by Mortgagor.*—The fact that a mortgage by a manufacturing company contemplates that possession of the mortgaged property shall be retained by the mortgagor, with the privilege of using and selling the same in its business, does not invalidate the mortgage where there is an implication that the proceeds from the sales will be reinvested in other materials essential to the continuance of the business or that other equivalent property might be substituted for that sold, thus augmenting the mortgage security and the estate of the debtor.  p. 697.

17.  CHATTEL MORTGAGES.—*Validity.*—*After-Acquired Property Clause.*—An "after-acquired property" clause in a chattel mortgage should be treated as an executory agreement covering the

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

property when acquired, operates as a present contract to give a lien, and is not affected by the appointment of a receiver for the mortgaged property, but confers upon the mortgagee an equitable lien on the proceeds of the mortgaged property in the hands of the receiver.  p. 697.

18.  CHATTEL MORTGAGES.—*Recording.—Effect.—Possession Not Necessary.*—Under the act for the recording of chattel mortgages (§7472 Burns 1914, §4913 R. S. 1881), the proper and timely recording of a chattel mortgage is constructive notice to third parties of the mortgagee's rights in the mortgaged property and obviates the necessity of possession thereof by the mortgagee.  p. 697.

19.  CHATTEL MORTGAGES.—*Property Mortgaged.—Proceeds of Mortgaged Property.*—A chattel mortgage on all the property of a manufacturing company confers upon the mortgagee an equitable lien on the proceeds of the mortgaged property resulting from the sale of its products, they being, in effect, the mortgaged chattels in another form.  p. 700.

20.  UNITED STATES.—*Contracts with.—Subcontractor's Rights under "Dent Act".*—The act of Congress known as the "Dent Act", authorized a lien in favor of a subcontractor when funds were awarded the prime contractor on a settlement and adjustment of war contracts, in the performance of which, the subcontractor had made expenditures, incurred obligations or rendered service, but it did not entitle a subcontractor to a lien on funds coming to the contractor on adjustment of a contract in which the subcontractor did not participate and with which it was not connected.  p. 701.

21.  UNITED STATES.—*Assignment of Contracts with Prohibited. —Contract not Included.*—The statutes of the United States (§§6338, 6890 U. S. Comp. Stat. 1918) prohibiting the assignment of contracts with the government were enacted for the protection of the United States and not to regulate the business transactions of private persons, and did not apply to the assignment of an interest in a special fund created to enable a manufacturing company to perform its contract with the government to manufacture certain war munitions.  p. 703.

22.  SUBROGATION.—*Indorsers of Notes.—Right to Securities Held by Payee.*—Indorsers who have paid a note are entitled to be subrogated to the rights of the payee in a fund on which he has a lien to secure the payment thereof.  p. 704.

From Marion Superior Court (A4,032) ; *Solon J. Carter,* Judge.

The Fletcher Savings and Trust Company was appointed receiver for an insolvent corporation.  From an

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

order fixing priorities between creditors, Irwin's Bank and others appeal. *Reversed in part, with directions.*

*Ralston, Gates, Lairy, VanNuys & Barnard, Baker & Richman, Watson & Esary, James W. Noel, Shirley, Whitcomb & Dowden, Olney & Comstock, Harold T. Edwards, Elmer W. Stout, Stitson, Jennings & Russell* and *Noel, Hickam & Boyd,* for appellants.

*Baker & Daniels, William W. Seagle, Charles Remster, Henry H. Hornbrook, Albert P. Smith, Paul Y. Davis, Kurt F. Panzer, Newberger, Simon & Davis, Rappaport & Kipp, Manifold & O'Hara, Robert J. Marsh, G. W. Payne* and *James M. Ogden,* for appellees.

MYERS, J.—This appeal is from an order and judgment of the Marion Superior Court, fixing priorities as between creditors of The Stenotype Company, an insolvent corporation. The Marion Superior Court, on November 14, 1918, appointed the Fletcher Savings and Trust Company receiver for the Stenotype Company, hereinafter referred to as "the company." The receiver so appointed proceeded to and has converted all of the assets of the insolvent corporation into cash, as shown by its report and supplemental report of January 17 and April 29, 1921, respectively.

The January report of the receiver classified the creditors of the company as follows: (1) Claims of laborers for personal services rendered the company prior to the appointment of a receiver; (2) claims of creditors, approximately four hundred in number, in whose favor liability was incurred by the company growing out of the performance by it of contracts with the Government of the United States for the manufacture and production of munitions; (3) claims in favor of those who indorsed government notes pursuant to contracts with the company and identified as guarantors' claims;

674    SUPREME COURT OF INDIANA,

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

(4) claims of creditors who incurred liability for the repayment of a loan of $75,000 with interest and commissions, pursuant to a contract with the company; (5) claims of creditors in whose favor liability was incurred in the general business of the company independent of its munition contracts, and also claims of preferred creditors who were not paid in full by the application of the particular fund set apart for that purpose.

In this connection, and bearing upon the questions here for decision, attention is drawn to the receiver's report wherein the money so received by it is classified as: (1) Mortgage fund which was derived from the sale of the real estate, buildings, machinery and other property of the company, aggregating $390,282.34, from which certain deductions were made by reason of prior liens and expenses incident to that fund; (2) money received from the collections of certain notes given to the company for the sale of stenotype machines, amounting to $31,457.04; (3) money paid the receiver by the Government on account of the cancellation of certain munitions contracts, totalling $396,848.32.

The receiver has discharged all obligations of the company to the United States Government, claims of laborers for personal service, and has turned over to the mortgage creditors the fund, less the amount required to pay prior liens, arising from the sale of all property held by the company at the time of the execution of the mortgage. Out of Fund No. 2, the receiver paid the Bankers Investment Company $19,464.54. There is no objection to the action of the court in ordering the receiver to make the above payments, nor to the court's allowances payable out of Fund No. 3 on account of the administration and settlement of the insolvent estate.

The question of priorities in the payment of claims between creditors or classes of creditors was presented

to the trial court by intervening petitions; First, by the Guaranty Trust Company of New York as trustee representing the mortgage creditors seeking priority over all creditors under the terms of the mortgage; Second, the Bankers Investment Company asserting priority of payment out of Fund No. 2 of the balance due it by virtue of a contract bgetween the company and itself of date August 12, 1914; Third, the munition creditors—material-men—claiming priority in the payment of their claims out of Fund No. 3 on the theory of an equitable assignment and lien on that fund, in accordance with the contracts of February 7, 14 and April 15, 1918, between the company and its guarantors on notes to the United States Government, and its indorsers of notes to the Continental National Bank and Irwin's Bank; Fourth, the Riverside Metal Company insists that it was entitled to priority over all of these intervening creditors on the ground that it was a subcontractor of the Stenotype Company, and, as such, a commitment creditor under an Act of Congress known as "the Dent Act"; Fifth, Stoughton A. Fletcher, Bankers Investment Company, William G. Irwin, and Irwin's Bank demand priority of payment of their claims out of Fund No. 3 under the provisions of a contract between the company and the Continental National Bank, Irwin's Bank and these intervenors, of date February 14, 1918, whereby these banks loaned the company $75,000 with Fletcher, Bankers Investment Company and William G. Irwin as indorsers. The notes to the Continental National Bank were paid by the indorsers. The five notes to Irwin's Bank, aggregating $25,000, do not appear to have been paid.

The trial court, upon the issues thus tendered, found the order of priority in the payment of claims out of Fund No. 3 as follows: First, Munition creditors; Second, Commissions to guarantors of Government notes;

Third, Fletcher, Bankers Investment Company and Irwin on account of notes indorsed by them; Fourth, Commissions in favor of the last named parties by reason of their indorsements.

The Riverside Metal Company's claim of priority over other munition creditors, and that of the Guaranty Trust Company, and the demand of the Bankers Investment Company to the balance of the fund arising from the collection of stenotype notes, were each denied. The action of the court upon the various issues tendered is questioned by proper assignments of error.

From a careful examination of the record, briefs on file, and from counsel's oral argument, we are impressed with the thought that many of the questions here presented have their origin in the conclusion of counsel as to the legal effect of the contracts of date August 12, 1914, February 7 and 14, and April 15, 1918, and the mortgage dated May 1, and recorded May 29, 1917.

For the purposes of this opinion, we will refer to creditors represented by the Guaranty Trust Company, trustee, as "Guaranty Company"; the indorsers on the $300,000 note to the government as "Goodrich"; creditors S. A. Fletcher, Bankers Investment Company, and William G. Irwin, indorsers for a loan of $75,000 to the company, as "Fletcher"; creditors growing out of contracts for material furnished and to be furnished in connection with the performance of the company's contracts with the Government of the United States for the manufacture and production of munitions as "munitions creditors"; and the Bankers Investment Company as the "Bankers."

We will first call attention to the claims of the "Bankers" against Fund No. 2. It takes the position, first, that it was entitled to all of the money collected by the receiver on account of notes of the company in its hands at the time of the receiver's appointment. At the trial,

it was agreed that the receiver had collected on account of stenotype notes $31,457.04, which included notes actually discounted and delivered to the "Bankers" in the sum of $23,396.34. From this latter amount, the receiver paid school commissions amounting to $3,257.85, and allowed discounts on notes paid before maturity in the sum of $673.95, totalling $3,931.80, leaving a balance of $19,464.54, which was paid to the "Bankers."

The general rule often announced is that a receiver, assignee or other trustee of an insolvent concern appointed for the purpose of winding up its affairs 1-3. takes the trust property impressed with the then legal or equitable rights of creditors. *Lamb, Rec.,* v. *Morris* (1889), 118 Ind. 179, 184, 4 L. R. A. 111; *H. C. Smith Coal Co.* v. *Finley* (1921), 190 Ind. 481; *Hubbard* v. *Security Trust Co.* (1906), 38 Ind. App. 156; *Mitchell* v. *Winslow* (1843), 2 Story (U. S.) 630, 637; *Chicago, etc., Trust Co., Receiver,* v. *Smith, Trustee* (1895), 158 Ill. 417, 41 N. E. 1076; *Gere* v. *Dibble* (1858), 17 How. Prac. (N. Y.) 31. The phrase "rights of creditors," under such circumstances, does not exclude the conclusion that a preference may be good between the parties but not good against other creditors unless perfected as required by law. So that a controversy between creditors affecting their rights on distribution is determined judicially, as of the date of the appointment of the trust officer, and as affected, if at all, by such transfer of the property. *Strebel* v. *Bligh* (1915), 183 Ind. 537, 542; *Hastings* v. *Lincoln Trust Co.* (1921), 115 Wash. 492, 197 Pac. 627, 18 A. L. R. 583. At this point, it may be well to state that we have considered carefully the record in this case, and for aught appearing, the rights of these contestants will be determined upon the theory that the receiver stands in the shoes of the company.

The bankers assert that the above allowances made by the receiver were unauthorized and in violation of its August 12, 1914, contract with the company,

4. or, in other words, the notes held by the bankers were impressed with the terms of the contract and were unaffected by the appointment of the receiver or transfer of the property. It is not claimed that the bankers waived any of its rights under the contract, nor is our attention drawn to any stipulation therein authorizing the company or the receiver to make any such allowances, or that the receiver was given any such authority by any order or direction of the court under which it was acting prior to the order approving the report of distribution, which is the order and judgment challenged by this appeal. Furthermore, we observe from the testimony of the president of the insolvent corporation that the contract had nothing to do with commissions to schools. They were to be paid by the company. This admission by the president of the company, fitting in, as it does, with the insistence of the bankers, with nothing to counteract it, seems to be fairly conclusive that it was the intention of the parties, in case of any allowances such as was admitted by the receiver, that they should be paid by the company. Considering this showing along with the rule "that the superior rights and equities of creditors are to be preserved in the fund to the same extent that they existed in the property sold," (*Mueller* v. *Stinesville, etc., Stone Co.* [1900], 154 Ind. 230, 235) and that the receiver, although an arm of the court, had no greater power or authority in this particular than the company, we must conclude that the allowances—$3,981.80—made by the receiver against the fund created by the collection of the notes actually discounted, was an improper deduction, and, therefore, the insistence of the bankers in this

regard must be sustained. *Chicago, etc., Trust Co., Receiver*, v. *Smith, Trustee, supra.*

Second: The bankers insist that it was entitled to the proceeds of the stenotype notes which passed into the hands of the receiver from the company at the time the receiver was appointed. It is admitted that the receiver collected $15,258.84 from this class of notes. Out of this sum, the receiver paid to schools as commissions, $2,618.46, and allowed discounts on notes paid prior to their maturity, $647.88. Hence, the actual cash in the hands of the receiver on account of these notes is $11,992.50, which is subject to the payment of $3,931.80 to the bankers as and for commissions and discounts allowed by the receiver on notes actually in the possession of the bankers at the time the receiver was appointed.

The bankers, in support of its claim to the remainder of this fund, points to certain language in the contract of August 12, 1914, being parts of clauses 6 and 7.

Clause 6: "It is agreed and understood that the series of notes referred to in this contract and described as of the amount of Eighty-two Dollars and Fifty Cents ($82.50) shall be understood and construed to mean the whole series of notes taken by the said party of the second part for the deferred payments for the sale of each of their said stenotype machines."

Clause 7: "The said party of the second part, for the considerations aforesaid, agrees and guarantees to furnish, under the conditions and stipulations of this contract, to the said party of the first part, for and during the time of the existence of this contract, all of the total series of notes of Eighty-two Dollars and Fifty Cents ($82.50) each as aforesaid, taken by the said party of the second part in the course of its business, excepting so many thereof as may be required to take care of renewals, delinquents and cancellations, which shall not exceed twenty-five (25) per centum of the total number of notes so taken by the said party of the second part."

This contract covers twenty typewritten pages of the record, and, aside from the above quoted parts, in substance, states "that for and in consideration of the discount and sale of certain notes and contracts, which are hereinafter set forth and described, and the advancement of funds thereon" by the bankers to the company for notes taken in series by the company for the sale of stenotype machines manufactured by it, each series aggregating $82.50, which, with a cash payment of $25, represented a single sale. The time in each calendar month is fixed when the company should notify the bankers of the total number of series, each amounting to $82.50, it would offer for discount and sale on the first day of the succeeding month, and on the last day of the month, it was required to present the same duly listed for payment. On the next day, the bankers was to pay $54 for each series, and on the eleventh succeeding month the further sum of $5, and $5 on the fourteenth month and $8.50 on the sixteenth month, aggregating $72.50 for each series. The bankers was to appoint some person in the employ of the company as its agents, mutually agreeable to both parties, and pay him $5 annually as collector of all the notes so sold, and who was given authority to withdraw from the bankers or the trustee—Security Trust Company—any notes held by either the bankers or trustee thirty days prior to maturities. The funds so collected were to be deposited with the Security Trust Company, trustee. Provision was made for the return to the company by the collector at certain periods of all uncollected notes, and the company agreed to pay for the same in cash. The bankers reserved the right to reject any series of notes when it appeared that the maker of the same, at the time of their execution, had not paid $25 in cash, or when the notes or contracts for the sale of the machines were not in compliance with the laws of the

state where executed, or when the whole series was not included in the offering. It was also agreed "that all of the notes and series of notes so offered for sale and discount shall include only those which bear date within the first calendar month next preceding the month of their discount and sale." However, this provision could be waived by mutual consent of the parties. All notes offered for discount and sale under the terms of this contract "shall bear the signature of the purchaser of the machine, as principal, an additional name as security for him, and the indorsement and guarantee of the party of the second part." In case of cancellation of any contract of sale of any machine, and the notes therefor were held by the bankers or the trustee, the company was authorized to take them up by paying for them in cash or by substituting new notes. The bankers reserved the right to reject "any note, notes or series of notes not complying with any of the provisions and conditions of this contract."

The bankers relies upon the contract stipulations, and insists upon the application of the maxim, "Equity regards as done that which ought to be done." In speaking of this maxim, Mr. Pomeroy says: "In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given, or transferred as security for the obligation." 3 Pomeroy, Equity Jurisprudence (4th ed.) §1235. Furthermore, in the same book, §1237: "The form or particular nature of the agreement which shall create a lien is not very material, for equity looks at the final intent and purpose rather than at the form; and if the intent appear to give, or to change, or to pledge prop-

erty, real or personal, as a security for an obligation, and the property is so described that the principal things intended to be given or charged can be sufficiently identified, the lien follows."

The petitioner relies specially upon the decision in the case of *Hurley* v. *Atchison, etc., R. Co.* (1909), 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729. In that case, the railway company advanced money on certain unmined coal which, according to a written contract theretofore made, was to be mined and delivered to it from day to day as required. The coal company was adjudicated a bankrupt. Receivers were appointed and authorized to continue the business of the bankrupt until trustees should be chosen. While the receivers were in charge, the railway company and two former lessors filed their joint intervening petition, praying that the lease contract be declared forfeited and the mine delivered back to them, or that the receivers be directed to deliver to the railway company sufficient coal to repay the money advanced by it. The petition was referred to the referee, who reported against granting the relief asked. This report was afterwards confirmed by the district judge, and on appeal to the Circuit Court of Appeals from the order dismissing the petition (*Atchison, etc., R. Co.* v. *Hurley* [1907], 153 Fed. 503, 82 C. C. A. 453), the court said, in substance, that the money advanced by the railway company was to be repaid by the delivery of coal from certain specific premises in accordance with the lease agreement, and, but for the appointment of a receiver, and later, trustees who operated the mine under the order of the court (p. 508) "the railway company could have enforced its claim for advantages [advancements] against the coal when mined by the coal company." In the same opinion, p. 510, it is said: "They (trustees in bankruptcy) mined coal, delivered it to the railway

company, and, in the language of the trial court, 'performed fully all the terms of the contract as it was written,' but failed to conform to the condition created by the oral agreement to deliver coal to the railway company in payment of the advances made by it to keep the mine going," and concluded with the statement "that the learned trial court should have sustained the interveners' petition and surrendered to them the leased premises or required the trustees, upon the assumption of the lease, to perform the condition of mining and furnishing the railway company sufficient coal to cover its advances. Not having done so and the lease having expired so that it cannot now be done, the assets of the estate, consisting in part of money received for coal delivered to the railway company, should be subjected to the payment of such advances as a preferential claim." This conclusion, approved by the Supreme Court, rests upon the well known principle that one cannot have the benefits of a contract without assuming its burdens. On appeal, the Supreme Court observed that, from all the circumstances, it was the intention of all the parties to pledge a sufficient amount of coal after it should be mined as security for the payment of advances made. The court said, (213 U. S. 126, 134, 29 Sup. Ct. 466, 469, 53 L. Ed. 729) : "This result is not expressed in the conventional form of a mortgage or pledge, but the method of producing it was devised for the purpose of acquiring the needed money by the coal company and of furnishing security for its repayment."

In the instant case, an examination of the contract and the evidence tending to show the circumstances surrounding its making, indicates a purpose on the part of the company to offer for discount and the bankers to accept a certain class of notes which the company might receive on account of the sale of stenotype ma-

chines of its own manufacture. The bankers was interested because of the profits from the discounts, and the company was interested in turning its bills receivable into cash for use in financing its business. The contract is explicit in identifying the class of notes covered by it, and there is no claim of its modification in that particular.

The original contract arrangement between the bankers and the company did not contemplate advanced payments. That element, if at all, came into the transaction when the company appropriated to its own use, without the bankers' consent, money collected on account of notes discounted and held by the bankers. Upon the discovery of this situation, the bankers insists that an oral agreement was made whereby such appropriation was to be treated as an advancement on all assigned or unassigned stenotype notes, and, by reason thereof, it was entitled to an equitable lien on all notes *specified in the contract,* or the proceeds arising therefrom, regardless from whom the receiver obtained them. Grant the fact stated in the petition that it was orally agreed that the money appropriated by the company was to be repaid "from the proceeds of any and all subsequent notes assigned or unassigned *covered by the terms of said contract."* The affirmance or denial of the insistence thus submitted must necessarily depend upon an answer to the question—Were the notes which passed to the receiver from the company, or any of them, whether assigned or unassigned, *covered by the terms of the contract?* The August 12, contract did identify certain notes which were subject to discount thereunder. The allegations of the petition, to which we have referred, express the intention of the parties to pledge all notes "covered by the terms of said contract" as security for the payment of the money appropriated by the company to its own

use. The president of the company testified that he knew of no notes not discounted which might have been under the contract. This petitioner has not pointed to any evidence, nor have we been able to find any, showing that on November 14, 1918, the company was in possession of stenotype notes meeting the description set forth in the contract entitling them to discount. It must be kept in mind that the contract did not call for stenotype notes generally, as did the railway company's contract for coal. Had it done so, then we might say the particular property upon which the lien was intended was sufficiently identified when it was made to appear that the notes evidenced the unpaid purchase price of stenotype machines. Moreover, it does not appear that the receiver undertook to carry out the company's contract with the bankers, as did the receivers and trustees in bankruptcy in the Hurley case, other than it assumed, by general consent, the collection of the notes, with the understanding that the rights of the parties should not be affected thereby. This petitioner is asserting an equitable lien on the notes delivered by the company to the receiver upon the theory, briefly stated, that the company needed money in the prosecution of its business, and it was furnished by the bankers. However, it will be noticed that the money furnished was pursuant to a contract requiring a deposit of notes of the face value largely in excess of the money furnished. Again referring to the evidence, it appears that between August 12, 1914, and June 1, 1918, this petitioner discounted a large volume of notes taken by the company in series of $82.50, balance due on account of single sales of stenotype machines. On the latter date, an accounting was had between these parties, and the conclusion reached that the company was indebted to this petitioner as follows: $7,529 for money collected by the company from the discounted

notes, and $20,000 as interest on balances due from time to time by reason of overdue uncollected notes, or from failure to promptly settle for notes which had been collected. This settlement was evidenced by notes on which payments of $2,500 and $4,019.90 were later made. There was no change in the method of keeping the books of this account, nor was there any change in the August 12, contract. The so-called adjustment of the books did not disturb the discounted notes held by the petitioner. ' The bankers continued discounting the company's notes until the receiver was appointed. The bankers' bookkeeper testified that on November 14, 1918, "The notes assigned to us, assigned to and held by the Bankers Investment Company amounted to $47,467.50." They were individual notes, from ten to twenty-five dollars each. If these notes were all paid, "we would have owed them (Stenotype Company) $24,594.73." This excess was to be applied on the notes given in settlement of the June adjustment. We, therefore, hold that at the time the receiver was appointed, the bankers held an enforceable lien on all unassigned notes identified by or within the terms of the contract, as well as on all previously assigned notes uncollected from the makers, except such as may have been redeemed by the company, either in cash or by the substitution of other notes. This lien was enforceable against the company and likewise against the receiver, but we are unable to determine from the evidence which notes, if any, or the aggregate of the notes in dollars and cents that were pledged to the bankers and by the company delivered to the receiver. The bankers' second contention, in so far as it pertains to the notes which passed to the receiver from the company, is not sustained.

Fund No. 3 was the culmination of events beginning early in the year 1918. In February, 1918, the com-

pany secured certain war munitions contracts with the United States Government, but being unable financially to handle the same, the government proposed to loan the company $300,000, payable on demand, with six per cent. interest from date, providing the company secured satisfactory indorsements or guarantees for the repayment of the loan. Accordingly, on February 7, 1918, the company entered into a contract with "Goodrich" and his associates, whereby they became the indorsers for the company to the government.on a note of that date for $300,000, upon the condition that the company would save them harmless from all loss on account of their indorsements, and would pay to them jointly a sum equal to ten per cent. of the liability so assumed. This contract, in substance, further provided that all money received by the company from the government, whether loaned or otherwise, on account of munitions contracts, should be deposited with the Fletcher American National Bank, separate and apart from all other accounts of the company, and so maintained until its liability to these indorsers was discharged. O. P. Welborn was appointed the agent and representative of these indorsers, with authority to act in their behalf in determining the purposes for which the money so deposited might be used, that is to say, it could be withdrawn only by check issued in the name of the company and countersigned by Welborn. However, none of these funds were to be withdrawn except when necessary to be used by the company "in the payment and discharging of actual and necessary expense of material, labor, machinery, and appliances, or other necessary expense incurred directly" by the company "in the performance and fulfillment of its munitions contracts with the government of the United States and, to that end," Welborn was to have joint control with the company of these funds. Upon payment of

the government loan and interest, "and after all legitimate costs and expenses incident to the actual manufacture and delivery of" 1,000,000 fuses and 2,200,000 rifle grenades, as per certain government orders, "shall have been fully paid and discharged," then Welborn was "expressly authorized and directed to withdraw from the funds remaining on deposit, independent of any action" of the company, "a sum equal to ten per cent. (10%) of the liability assumed by the" indorsers of the note, and this done and the indorsers fully released terminated the contract.

The note was executed, but before the company entered upon the manufacture of the munitions mentioned in the above contract, it appears that it was unable to meet its payrolls or to proceed with the work until it obtained additional finances. Thereupon, on February 14, 1918, it entered into a contract with the Continental National Bank and Irwin's Bank as second party, and S. A. Fletcher, W. G. Irwin and Bankers Investment Company third party, which, in substance, provided that the company should borrow from the Continental National Bank $25,000, evidenced by a note indorsed by the bankers, and $25,000 on a note indorsed by S. A. Fletcher, and from Irwin's Bank $25,000 on notes indorsed by W. G. Irwin, which indorsements were made in consideration of $20,000 to be divided pro rata between the indorsers and subject to the terms and conditions that the Continental National Bank deposit with itself, in a special account, the money so loaned by it, and that Irwin's Bank deposit with itself, in a special account, the money so loaned by it, to be withdrawn from each bank only on the signature of the company, and counter-signed by Ward H. Watson or Bert McBride for deposit with the Fletcher American National Bank for the company's use in paying certain obligations and accounts which were to be first listed and

submitted to O. P. Welborn of the latter bank for his approval. Then, by recitals, it appears that the company had been awarded "certain munitions contracts with the United States Government for the manufacture and delivery of certain war munitions, being identified as orders No. P-2463-868 Tw, G-1573-568 Tw, and P-373-603 G"; that from the proceeds for munitions so furnished, the *company was obligated* to reimburse the government "for loans of money made and advanced to it, the payment of obligations to the indorsers of its note to the United States Government, and the costs of the manufacture and delivery of said products, including machinery, equipment, labor and material, and other necessary expense"; that the proceeds both from loans from the government and from munitions contracts were to be deposited with the Fletcher American National Bank, separate and apart from all other funds of the company. Then follows the agreement assigning and delivering to the Continental National Bank and Irwin's Bank first, and to said indorsers second, the entire account so deposited with the Fletcher American National Bank, as well as subsequent deposits, "subject only to the right" of the company to carry out and fulfill its agreements with the government and its indorsers upon the government note, "intending hereby to vest in" the Continental National Bank and Irwin's Bank and the indorsers "full and complete title in and to said fund after all obligations to the government of the United States have been discharged therefrom, and all obligations to the sureties on said note to the United States Government have been fully discharged." The residue of the fund to be distributed by Welborn, first, to the payment of the notes; second, in payment of compensation to the indorsers; and third, after payment of the notes and the agreed compensation to the

690 SUPREME COURT OF INDIANA,

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

indorsers, the remainder of the fund was to be paid to the company.

It will be noticed that the company, in so. far as it was able so to do, by the contract of February 14, transferred its entire income from immediate munitions contracts, first, to the Continental and Irwin Banks, and second, to the indorsers of the notes to those banks. Both February 7 and 14, contracts had the effect of separating the government transactions from the regular business in which the company was engaged. Immediately following the execution of the February 14, contract, and the furnishing of the money by the two banks, certain indebtedness was thereupon, by the company and Welborn, audited and paid, and the company went into the market for material with which to fulfill its contracts with the government. Under both the above contracts, no money could be withdrawn from the special fund thus created without the sanction of Welborn. Up to this time, the company had no munition creditors, but it did have government contracts for the manufacture and delivery of certain war munitions. While it may well be said that at the time of making the February 7, contract, the company's principal purpose was to provide ways and means essential to the performance of the government contracts, yet the wording of the February 7, contract compels the conclusion that the parties thereto had in mind two objects only, (1) that of the company, to secure financial aid, and (2) that of the indorsers, to protect themselves against loss on account of their indorsements of the $300,000 note, and promised compensation for the liability they assumed. The loan of $300,000 was to the company, but, by the terms of its contract with the indorsers, the proceeds of that loan, as well as all other funds thereafter received from the government, were placed under the joint control of the

company and the representative of the indorsers, to be withdrawn only as the necessities of performance of the munitions contracts might seem to require.

In the contract whereby the indorsers became bound, there is no unqualified stipulation specifically requiring the payment of all or any particular labor, material or other expense of manufacturing contracted munitions. In this instance, labor was paid, and hence we are concerned only with the claims of materialmen whose claims, it is said, the controllers of the fund were required to pay in order to meet the company's obligations to the government. Such a situation might have arisen, or it might not, all depending upon the credit of the company in the market for materials. The munitions creditors point to the provision providing for the payment "of all legitimate costs and expenses incident to the actual manufacture and delivery" of 1,000,000 fuses, war contract of February 1, 1918, and 2,200,000 rifle grenades, war contract of February 15, 1918. That provision was obviously for the benefit of the company in that it made the payment of the ten per cent. commission to the indorsers junior to the payment of all other expenses essential to the performance of its war contracts. Grant that under the contracts of February 7 and 14, consent was given by the indorsers to pay the cost of material and other expenses, but that was not enough. The munition creditors are relying upon an equitable lien. They are seeking equitable relief, the enforcement of which depends upon the clearness of intention of the parties from the expression of their contractual relations found in the contract, completely eliminating vagueness or uncertainty as to the terms or substance of the agreement. *In re Stiger* (1913), 209 Fed. 148, 126 C. C. A. 96. The mere consent that such payments might be made did not amount to an order on the company and

692    SUPREME COURT OF INDIANA,

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

Welborn to pay them, nor was it sufficient as an assignment or an appropriation of the fund for that purpose. The payment of a munition creditor out of the special fund required affirmative action on the part of the debtor, an element inconsistent with the essentials of an equitable lien. The well-settled rule is that the holder of the fund must be authorized to pay claims directly to the creditors without further intervention of the debtor. *Reynolds* v. *Louisville, etc., R. Co.* (1895), 143 Ind. 579, 628; *Reed* v. *Adams, etc., Wire Works* (1914), 57 Ind. App. 259, 265; *Rawlings* v. *Vreeland* (1920), 76 Ind. App. 209, 217; *Shannon* v. *Mayor of Hoboken* (1883), 37 N. J. Eq. 123; *Simson* v. *Brown* (1877), 68 N. Y. 355; *Trist* v. *Child* (1874), 21 Wall. 441, 22 L. Ed. 623; *Dillon* v. *Barnard* (1874), 21 Wall. 430, 22 L. Ed. 673.

It is not our purpose to hold that a contract may not be made for the benefit of a third person although such person may not be specifically mentioned, but we 9. do hold that a contract, to have such effect, must clearly evidence a distinct intention to benefit such third person. *Simson* v. *Brown, supra; Carnahan* v. *Tousey* (1882), 93 Ind. 561; *Beveridge* v. *New York, etc., R. Co.* (1888), 112 N. Y. 1, 19 N. E. 489, 2 L. R. A. 648; *Wheat* v. *Rice* (1884), 97 N. Y. 296; *Serviss* v. *McDonnell* (1887), 107 N. Y. 260, 14 N. E. 314.

Here it may be well to note that the company, on April 8, 19 and 20, 1918, entered into other contracts with the government for war munitions, and on May 7, 1918, executed its note to the government for $600,000, with Ed. W. Schildhauer and others as sureties. The suretyship thus assumed by these persons was pursuant to a contract between them and the company of date April 15, 1918. The munitions contracts were all canceled by the government before time for

completion of any of them. Thereafter, and pursuant to an Act of Congress approved March 2, 1919 (40 Stat. at L. 1273, §10378, *et seq.* Barnes Fed. Code, 1922 Supp.; §§3115 14/15a-3115 14/15e U. S. Comp. Stat. Supp. 1919), and known as the "Dent Act," the receiver settled and adjusted the various claims of the company against the government growing out of these munition contracts. By this settlement, the government recouped its loans, interest, advances, and took credit for the agreed salvage. Each of these contracts seems to have been considered separately, and awards made in money to the contractor as follows: February 1, contract, $194,223.06; February 15, contract, $261,842.89; April 8, contract, $12,273.66; April 20, contract, $176,161.11, and to the government on the April 19, contract, $346,254.02. The government thereby consumed the entire awards on the three April contracts, and $157,819.25 of the award on the contract of February 15.

A final analysis of all the figures entering into the aggregate amount of money reported by the receiver as coming from the government on account of these war munitions transactions, and here referred to as "Fund No. 3," is made up as follows: Five per cent. retained by the government on all deliveries, amounting to $56,426.26; the net amount of the award on claims against the government growing out of suspension of contracts, engineering changes and claims for delays, $298,246.70; proceeds from the sale of government owned materials, $37,428.46; interest received, $1,215.94; totalling, $393,317.36. Out of this total, the trial court allowed and ordered paid on account of services rendered by the receiver, $40,000, attorneys $92,933, and other costs and expenses of administration. After these deductions, the balance, with interest, is the fund for distribution. The claims allowed on

account of munition contracts, as we understand the showing made, aggregated $463,065.63.

Returning to the priority insistence of the munitions creditors, and in support of their asserted equitable lien as against "Fletcher" especially, they refer us to the preliminary statement to the contract of February 14, introduced by the word "WHEREAS," which they construe as amounting to an implied promise to pay them out of the fund mentioned in that contract in preference to the loan by the two banks. We do not so construe these recitals. The parties, by the recitals, evidently had in mind the provision in the February 7, contract making the payment of commissions junior to the payment for materials and other necessary expenses, which was left to the business judgment of the company and Welborn. The preliminary recitals in a contract may be persuasive in determining the intention of the parties thereto when the language expressing their contractual relations is ambiguous, uncertain and indefinite, but they should never be allowed to control, as here, the clearly expressed stipulations of the parties. *Hansbarger* v. *Hansbarger* (1919), 206 Mich. 281, 172 N. W. 577, 581; *Dick Co.* v. *Sherwood Letter File Co.* (1895), 157 Ill. 325, 42 N. E. 440; *Martin* v. *Rothwell* (1918), 81 W. Va. 681, 95 S. E. 189. This court, in *Reynolds* v. *Louisville, etc., R. Co., supra*, p. 641, approved the statement that "the effect of recitals in a contract is limited to the parties thereto." The recitals being so limited, and the munition creditors being neither a party or privy to either the February 7 or 14 contracts, it follows that these creditors cannot base any enforceable right on such recitals.

Some of the munition creditors assert that the company had no authority to assign the special fund covered by the February 7, contract without the consent of

NOVEMBER TERM, 1924. 695

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

all the other parties thereto. We cannot agree with this contention. There is not a word in the contract to prohibit such assignment. The assignment of this fund did not affect any contract obligation pertaining to its origination or distribution. It specifically conceded priority payment of the government note and indorsers' commissions. Further than that, the "Fletcher" agreement or assignment proper contained no language which, when reasonably construed, directed the company and Welborn to pay the expenses of any material or other expenses in the manufacture of munitions prior to the payment of the notes to the two banks. While authority to the company and Welborn to make payments of this character out of the special fund was not withheld, yet their right so to do was, by the contract of February 7, made a question of necessity, to be decided by the company and Welborn jointly. It may be presumed that if any such questions arose, they were decided, and payments out of the special fund granted or withheld, in compliance with such decision. The effect of the assignment was to make the fund a security for the debt to the banks, and indemnification to the indorsers on the bank notes, as well as security for the payment of the promised compensation. The amount of the fund remaining could not be foretold, but, in no event, did the company obligate itself to pay compensation beyond this fund. The receiver, with respect to the rights of creditors under the February 7 and 14, contracts, is in no better position to repudiate them than was the company. It received the items contract-controlled into a special fund, and, as such, now holds the same.

Something has been said on the subject of statutory liens. At this point, we may say, once for all, that there is no statute in this state applicable to the facts here appearing that would entitle any of the parties

before us to a lien.   The Federal statute, known as the "Dent Act," will receive attention later in this opinion.

Under the circumstances here shown, we are clearly of the opinion that the munition creditors are not entitled to an equitable lien and priority in the payment of their claims over "Fletcher."

The Guaranty Company answers the priority insistence of "Fletcher" by referring to the language of its mortgage, whereby the company granted, sold, 13, 14. assigned and transferred to the mortgagee, by detailed description, in words broad and comprehensive enough not only to include all the property it then had but all it might have in the future, and asserts that, by the foregoing provision, all money received and collected by the receiver, and all accounts and bills receivable, choses in action and contracts which came into the possession of the receiver, except items actually pledged in a legal way or upon which a specific lien by garnishment, attachment or execution was acquired prior to the appointment of the receiver, was covered by the mortgage.   The mortgage antedated the February and April contracts, and, as a general proposition of law, it may be said that the recording of the mortgage was constructive notice to all persons claiming under the mortgagor.   In the instant case, the property or fund in question was not in existence at the time the mortgage was executed, nor has it at any time been under the unqualified control of the mortgagor.   It was set aside and retained in a special account for specific uses.   This fund, as we have seen, resulted through the activities of the company in the performance of the February 1 and 15, contracts, whereby the government was furnished 275,800 fuses and 1,225,876 grenades. It is difficult, if not impossible, for us to determine from the evidence the exact credits and debits occasioned by these contracts separately.   However, it does

appear from an unchallenged affirmative showing that the expenses for materials, appliances or other necessary expenses essential to the performance of these contracts were not all paid. Moreover, upon all the evidence submitted, we feel safe in saying that the debts of the company on account of the aforesaid expenses and the indorsers' commissions largely exceed the fund by contract segregated from all other funds of the company and now held by the receiver for distribution. This being true, there is no surplus or profit in this fund for either the company or the receiver to which the mortgage could attach.

The Guaranty Company further claims priority over all other creditors in the payment of its claim out of the undisposed proceeds from the collection of 15-18. stenotype notes. This claim is predicated upon the after-acquired property clause in the mortgage, which certain of the creditors insist was void because the company was permitted to retain possession, manage, operate and use the mortgaged property, collect, receive, take, use and enjoy the earnings, income, rents, issues and profits thereof until default in the performance of some covenant or condition of the mortgage, without being required to account for the same as the agent of the mortgagee. Citing, *New* v. *Sailors* (1888), 114 Ind. 407, 5 Am. St. 632; *Stout* v. *Price* (1900), 24 Ind. App. 360; *New Albany Ins. Co.* v. *Wilcoxson* (1863), 21 Ind. 355; *Mobley* v. *Letts* (1872), 61 Ind. 11; *Davenport* v. *Foulke* (1879), 68 Ind. 382, 34 Am. Rep. 265; *Lockwood* v. *Harding* (1881), 79 Ind. 129; *Robinson* v. *Elliott* (1874), 22 Wall. 513, 22 L. Ed. 758.

All of the Indiana cases above cited, except the first two and the case of Lockwood v. Harding, were impliedly overruled by the case of *McFadden, Admr.,* v. *Fritz* (1883), 90 Ind. 590, wherein the court referred

to *Mobley* v. *Letts, supra,* which followed the older cases, and said: "The rule laid down in that case appears to be in accordance with the common-law principles and the usual practice of courts. But in a series of cases it has been recently held by this court that under our statute of frauds and perjuries, * * * 'a recorded mortgage, upon its face, can not be declared fraudulent and void as against creditors; that fraud, in such case, is a question of fact to be submitted to the court or jury upon the trial.'" The Lockwood case, in so far as any opinion is expressed, is in line with the McFadden case, and we decline to follow the Robinson case on the point to which it is cited. The other two cases turned upon the showing of an understanding between the mortgagor and mortgagee amounting to a secret trust for the benefit of the mortgagor. No such showing is here made, unless it can be said that the mortgage, upon its face, may be thus construed or be deemed fraudulent as to other creditors. As we read the mortgage, there is no purpose to create a trust for the benefit of the mortgagor, or pretense of any fraud, either actual or constructive, or suggestion of any intentional concealment on the part of the mortgagor; nor claim of a permissible diversion of the funds of the company to matters outside of its regular business. The absence of extrinsic facts other than those naturally inferred from the nature of the mortgagor's business, general situation and circumstances surrounding the parties to the mortgage at the time of its execution, when considered in connection with the language used, justifies the implication that sales would be made by the mortgagor in the usual course of its business, and the proceeds therefrom reinvested in other materials essential to the continuing of the business, or that other equivalent property might be substituted for that sold, thus augmenting the mortgage security and

the estate of the debtor, which is inconsistent with personal benefits in opposition to the rights of creditors. Such must have been the intention of the parties if the business was to be actively continued. This being the intention of the parties expressed in the mortgage, such transitional property would be freed from the mortgage lien in the hands of third parties in the usual course of trade. But, it is urged that the future property clause in the mortgage is not enforceable at law against the general creditors who, it is insisted, acquired an interest in the stenotype fund prior to possession by the mortgagee. This asserted interest is predicated upon the showing of the appointment of the receiver, and the choses in action from which the fund in question was derived passed, not to the mortgagee, but into the hands of a representative of the creditors. Federal and New York state cases are cited to support this contention. Many more might be added to those cited, but this is not a case where the rights of the parties are to be controlled by principles applicable alone to cases at law. In the instant case, equitable relief was sought. The question as here presented is governed by purely equitable principles. Applying this doctrine to the face of the mortgage, the after-acquired property clause therein may be sustained upon the theory that the mortgage should be treated as an executory agreement covering the property when acquired, subject to prior liens thereon. "A receiver is not an innocent purchaser or purchaser for value in any sense." *Fletcher Amer. Nat. Bank* v. *McDermid, Rec.* (1920), 76 Ind. App. 150, 160. The possession of a debtor's property by a receiver is one of the steps in the law whereby the rights of all parties, debtors and creditors, are protected and preserved. In this case, it appears the mortgage was recorded in due time. Under our recording acts, the recording of the mort-

700     SUPREME COURT OF INDIANA,

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

gage was not only constructive notice to third parties of the mortgagee's rights in the mortgaged property, but it obviated the necessity of possession thereof by the mortgagee. *Lumbert* v. *Woodward* (1896), 144 Ind. 335, 341, 55 Am. St. 175.

It must be kept in mind that the mortgagee is not seeking to enforce a claim of a present legal title to the fund, but to impress upon it a lien according to the agreement of the parties, for, as said in *Flanagan Bank* v. *Graham* (1903), 42 Ore. 403, 418, 71 Pac. 137, 142: "The instrument called a 'mortgage,' under such conditions, is construed as operating by way of a present contract to give a lien, which, as between the parties and all others having notice or knowledge thereof, takes effect or attaches to the subject as soon as it comes into the ownership of the mortgaging party." See, also, *Chissom* v. *Hawkins* (1858), 11 Ind. 316; *France* v. *Thomas* (1885), 86 Mo. 80; *Brady* v. *Johnson, Trustees* (1892), 75 Md. 445, 26 Atl. 49, 20 L. R. A. 737; *Keating* v. *Hannenkamp* (1889), 100 Mo. 161, 13 S. W. 89; *Mitchell* v. *Winslow, supra;* Jones, Chattel Mortgages (5th ed.) §170; Jones, Mortgages (7th ed.) §153.

Moreover, for aught appearing, the remaining stenotype note fund was the natural sequence of the property conveyed by the chattel mortgage; or, we 19. may say, the conveyed chattels in another form, permitted by the terms of the mortgage. If so, the fund would be charged with an enforceable equitable lien in favor of the mortgagee. We, therefore, conclude that the Guaranty Company, by virtue of its mortgage, has an equitable lien on the stenotype note fund for distribution superior to that of general creditors, who, with the "Bankers" out of the way, form the class interested, and the receiver should be ordered to distribute it accordingly. This conclusion disposes

of the entire balance of Fund No. 2, and hence it is needless for us to give any further attention to claimants on this fund.

Again addressing ourselves to Fund No. 3, and to the claims of "Goodrich" and "Schildhauer" for commissions, it is evident from what we have already said that their payment, by the terms of the contracts providing therefor, is junior to the payment of claims for expenses incurred in the manufacture of munitions. Under the "Goodrich" contract, the payment of these expenses would entirely exhaust the fund, and in the case of "Schildhauer," the entire credits in favor of the company were far less than the money advanced by the government. Hence, there is no basis for any liability to either "Goodrich" or "Schildhauer" for commissions, and consequently no grounds for any lien in their favor on this fund.

The Riverside Metal Company insisted in the court below, and is here insisting, on priority of payment of its claim over all other creditors on the theory

20. that its claim was presented and allowed in conformity with §4 of the Dent Act, *supra*, (§3115 14/15d U. S. Comp. St. Ann. Supp. 1919) under which it was made a commitment creditor entitled to priority as a subcontractor. It appears that on September 17, 1918, this company entered into a contract with the Stenotype Company whereby the former was to furnish the latter gilding metal for detonator cups, and soft brass for rubber carriers, all in connection with what was known as Mark "V" Fuse contract. This Mark "V" government contract was executed between the government and the Stenotype Company on April 19, 1918. On May 7, 1918, the government advanced to the Stenotype Company $600,000 for the purpose, clearly indicated by the evidence, of aiding the Stenotype Company to meet its government contracts

702    SUPREME COURT OF INDIANA,

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

of April 8, 19 and 20.   These contracts were canceled by the government and the metal company immediately thereafter notified of the government's action prior to any deliveries.   However, a large quantity of gilding metal had been manufactured in accordance with the particular specifications required by the Stenotype Company, for which the metal company claimed a cancellation charge of $7,750.80, which appears among the Government allowances in the adjustment of the April 19, Mark "V" contract.   This adjustment resulted in an award in favor of the government for $346,254.02, which, as we have seen, exhausted not only the awards in favor of the Stenotype Company on the three April contracts, but also reduced the award in favor of the Stenotype Company on the February 15, contract to the extent of $157,819.25.   True, the prime contractor in this case was insolvent, and §4 relied on by the metal company does authorize a lien in favor of the subcontractor when funds are awarded the prime contractor upon a settlement of the contract in the performance of which the subcontractor has made expenditures, incurred obligations or rendered service.   But here it appears conclusively that the prime contractor never received, nor was it ever entitled to, any funds with respect to any portion of the Mark "V" contract, on account of which the metal company made expenditures, incurred obligations and rendered service.   Under such circumstances, we know of no principle of law or rule of equity entitling this claimant to a lien or to any preferment in the way of payment of its claim out of a fund arising from contracts in which it did not participate and was in no way connected.   Hence, we hold that the Riverside Metal Company is in no better position to urge priority of payment out of the fund in question than any other munition creditor.

Finally, the metal company insists that neither the February contracts nor the mortgage furnishes a basis for legal preferences to such creditors, for the reason the subject of the preferences is a claim against the proceeds of a contract with the United States, which is prohibited by certain acts of Congress: §§6383, 6890 U. S. Comp. Stat. 1918. Section 6383, *supra*, provides that, "All transfers and assignments made of any claim upon the United States or any part or share thereof * * * shall be absolutely null and void, unless" certain requirements therein mentioned are observed. Section 6890, *supra*, provides that, "No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned." In view of the conclusions we have reached in this case, the attempted application of the foregoing Federal enactments is in no way material, other than an effort to defeat the claimed priority of "Fletcher" under the contract of February 14. The purpose of the above statutes was the protection of the United States and not to regulate the business transactions of private persons. Turning to the contracts, we find no language which tends in the least to show any intention of transferring or assigning any contract with or claim upon the United States, or any part of any contract or claim, but, on the contrary, these contracts were made to apply to the special fund deposited by the company in the Fletcher American National Bank. What we may term the "Fletcher" assignment had nothing whatever to do with any contract the company had with the United States. The promisee, "Fletcher," looked to the promisor, the "Company," and not to the

704    SUPREME COURT OF INDIANA,

Irwin's Bank *v.* Fletcher, etc., Trust Co., Rec.—195 Ind. 669.

government for the repayment of the bank loan. The insistence of the metal company in this particular is without merit.

Having thus determined the priority standing of each of the parties to this controversy relative to the funds in question, we are compelled to hold that the trial court erred in classifying the creditors at bar entitled to priority in payment of their claims out of Fund No. 2, in that, the Bankers Investment Company was and is entitled to priority in the payment of its claim in the sum of $3,931.80, and the Guaranty Trust Company, as trustee for the mortgage creditors, was and is entitled to the balance of this fund in preference to all other creditors involved in this appeal.

Furthermore, the trial court erred in its classification of creditors entitled to priority of payment in Fund No. 3, in that it appears that Stoughton A. Fletcher and the Bankers Investment Company, by paying the notes to the Continental National Bank, were thereby subrogated to the rights of the bank (*Hubbard* v. *Security Trust Co., supra; Warford* v. *Hankins* [1898], 150 Ind. 489), and, with Irwin's Bank, are entitled to payment *pro rata* out of this fund prior to the payment of any and all other claims of creditors, parties to this appeal. Furthermore, under the February 14, contract, the above indorsers, Stoughton A. Fletcher, Bankers Investment Company and Will G. Irwin were given an equitable lien on this fund for the payment of compensation for the liability they thus assumed, subject only to the repayment of the money borrowed from the two banks.

Hence, we hold that the creditors at bar be reclassified and the order of priority in the payment of their claims out of Fund No. 3 be as follows: (1) The payment of the $75,000 to the parties here shown to be entitled thereto; (2) The payment of $20,000 *pro rata* to

Stoughton A. Fletcher, Bankers Investment Company and Will G. Irwin, indorsers for the company on the notes to the Continental and Irwin's Banks; and (3) The payment of claims of all other creditors *pro rata* as one class.

Judgment reversed, in so far as it affects the distribution of the funds now in the hands of the receiver, with instructions to the trial court to restate its findings, and order the receiver to amend its report and distribute the funds now in its hands in accordance with this opinion, without further allowance to the receiver or attorneys for the receiver for the further administration and settlement of this estate, and for further proceedings not inconsistent with this opinion.

### ON PETITION FOR REHEARING.

MYERS, J.—The Riverside Metal Company and the other munition creditors collectively have petitioned for a rehearing. "Fletcher" moves for a more explicit declaration as to whether their claims in the amount allowed by the trial court or the figures, $75,000 and $20,000, in our opinion should be taken by the receiver as the basis for payment.

Each of the above petitioners seeks to resubmit, and they have reargued, many of the questions presented and decided in our original opinion. Upon a reconsideration of those questions, we deem it sufficient to say that we are still satisfied with our former conclusions.

Counsel for the "munition creditors" also assert that some contention has arisen between claimants over the distribution of the residue of Fund No. 3. This notice of discord, further evidenced by the "Fletcher" motion, seems to be caused largely by the figures in the last paragraph of our opinion, in which we held that the creditors should be reclassified. The figures

so used by us were for convenience and to identify certain claims in preference to the figures showing actual allowances made by the trial court. They were not used with any intention of changing or modifying the findings or judgment of that court as to the amount due the creditors severally. We fail to see any substantial reason for the alleged dispute, when it must be remembered that the judgment of the trial court fixing these allowances was in no manner criticized or challenged by any of the parties, either individually or collectively, to this appeal. This court was concerned only in the classification of creditors with respect to priority in the payment of their claims, and not in the various amounts thus severally allowed. The findings and judgment of the court below pertaining to the allowance of claims should be followed by the receiver, except as hereafter noted, and not the figures used in our opinion for the purpose of identifying claims.

The "munition creditors" seem inclined to place a construction upon the last paragraph of our original opinion which would give them priority of payment over general creditors. This insistence is sustainable only upon the theory that they had an equitable lien. We held otherwise. They are general creditors and should be classified as such. So that our ruling to reclassify "the creditors at bar" amounted to an order for a reclassification of them in accordance with the opinion, which gave certain of these creditors priority in the payment of their claims, based upon the several allowances so adjudicated by the trial court out of Funds Nos. 2 and 3. After applying such credits, any balance remaining in favor of either of these creditors must be regarded as a general claim, and be so considered in the pro rata distribution of the assets of the insolvent estate among the general creditors. Hence, our

classification 3 corresponds to classification 5 of the court below, with the above designated additions.

For the benefit of the receiver and all others concerned, it may be well for us to call attention to the comments in our original opinion relative to the trial court's classification 3—indorsers of government notes —from which it appears that all creditors thus classified have no enforceable claim against either the company or the receiver.

All petitions for a rehearing are denied. Motion sustained to the extent indicated above.