The Chicago Daily News, Inc., Defendant in Error, v. Mary Everett Kohler, Administratrix, Plaintiff in Error.

Gen. No. 37,224.

Opinion filed June 20, 1934.

WINSTON, STRAWN & SHAW, for plaintiff in error; EDWARD W. EVERETT and CHARLES J. CALDERINI, of counsel.

FISHER, BOYDEN, BELL, BOYD & MARSHALL, for defendant in error; THOMAS L. MARSHALL and DAVID A. WATTS, of counsel.

MR. JUSTICE WILSON delivered the opinion of the court.

This is an action on appeal to this court to reverse a judgment entered on the verdict of a jury awarding damages in favor of the plaintiff, The Chicago Daily News, and against the defendant, Mary Everett Kohler, administratrix of the estate of G. A. E. Kohler, deceased, for breach of contract. The pleadings consisted of a declaration, plea of the general issue and a plea of set-off.

The plaintiff, The Chicago Daily News, is a corporation engaged in the editing and publishing of a daily newspaper in the City of Chicago. G. A. E. Kohler, deceased, was at the time of the making of the con-

tract hereinafter referred to, doing business as Kohler Brothers and made and manufactured an article known as the Kohler Magazine Reels under a patent issued by the United States Government. This patent originated in the plant of The Chicago Daily News which, by reason thereof, was entitled to shop rights as shown by an agreement dated July 15, 1907. By this agreement the defendant hereinafter referred to as Kohler, for one dollar and other valuable consideration granted the right to The Chicago Daily News to use these reels in connection with its plant in the City of Chicago.

July 27, 1927, Kohler submitted to The Chicago Daily News a typewritten proposal which, among other things, contained the following:

"Gentlemen:

"We propose to furnish 72 Kohler Magazine Reels per specifications attached and made a part of this contract, for use in the plant of Chicago Daily News at Chicago, Illinois, subject to the following terms and conditions:

"Price for each reel, Four Thousand Dollars ($4,000.00) f.o.b. cars factory.

"Total Amount of Contract Two Hundred Eighty-eight Thousand ($288,000.00) Dollars.

"Terms of Payment: Twenty per cent (20%) in cash upon acceptance of contract by purchaser;

"Twenty per cent (20%) thirty (30) days thereafter;

"Twenty per cent (20%) sixty (60) days thereafter;

"Twenty per cent (20%) upon shipment;

"Twenty per cent (20%) ninety (90) days after shipment.

"Proportionate payments shall be made for partial shipments.

"Payment in full shall not relieve Kohler Brothers of the guarantees covered by this contract.

"SHIPMENT SHALL BE MADE on or about as specified . . . 19 . . .

"It is important that the installation of Presses is not delayed because of delay in shipment of the Reels, and the above shipping date is set accordingly. Purchaser, therefore, agrees to accept shipment on the specified date.

"The apparatus covered by this proposal is built to meet the special requirements of the purchaser, is applicable for this installation only, and this contract is therefore not subject to cancellation for any cause whatsoever.

"Foundations for reels, means for supporting belt shaft bearings on press structure, and drivers for connecting the belt shaft to the press shall be furnished by purchaser in accordance with drawings approved by Kohler Brothers.

"Purchaser shall furnish, or direct other interested parties to furnish, without expense to Kohler Brothers, all drawings, written data and dimensions which are in Kohler Brothers' opinion necessary for the installation and operation of the reels; and Kohler Brothers will furnish, without expense, the necessary drawings and data co-ordinating with the data so furnished.

"Any delay in securing this data will constitute a proportionate extension of the specified shipping date."

This proposal was accompanied by a letter, which was made a part of the agreement, as follows:

"July 27, 1927.

"The Chicago Daily News, Inc.,
15 North Wells Street,
Chicago.

"Gentlemen:

"As a part of our proposal of this date for seventy-two (72) Kohler Magazine Reels, we agree to allow you a credit of Ninety Thousand ($90,000.00) Dollars, making the total contract price One Hundred Ninety-

eight Thousand ($198,000.00) Dollars, equivalent to Two Thousand Seven Hundred Fifty ($2,750.00) Dollars each.

"We further agree to allow you the sum of Eighteen Thousand ($18,000.00) additional for which we are to receive the fifteen Kohler Magazine Reels now being used in your old pressroom, making the net amount of this contract One Hundred Eighty Thousand ($180,000.00) Dollars.

"This allowance is made because of the privilege extended to you in the agreement dated July 15, 1907, conceding your right to use these reels in the plant of The Chicago Daily News.

Respectfully submitted,
KOHLER BROTHERS
By G. A. E. Kohler (Signed)
G. A. E. Kohler.

"Accepted, August 4, 1927,
  THE CHICAGO DAILY NEWS, INC.
    By (Signed) Walter A. Strong
        President."

November 22, 1927, the contract was modified by agreement between the parties as to the terms of payment and as the question of payment is of importance in the construction of the cause, we set this agreement up in full:

"November 22, 1927.

"The Chicago Daily News, Inc.
15 North Wells Street,
Chicago, Illinois.

"Gentlemen:

"In accordance with the request of Mr. Walter A. Strong, we hereby agree to modify the terms of payment enumerated in our contract for seventy-two (72) Kohler Magazine Reels accepted August 4, 1927, to read as follows:

"20% of the contract price in cash upon acceptance of contract by purchaser.

"20% November 25, 1927

"10% February 1, 1928

"10% April 1, 1928

"10% June 1, 1928

"10% August 1, 1928

"10% October 1, 1928

"10% November 1, 1928

"Shipment of eight (8) of these reels will be made on or about December 1, 1927.

"Shipment of the sixty-four (64) remaining reels to be made on September 1, 1928.

Very truly yours,

KOHLER BROTHERS

By G. A. E. Kohler (Signed)"

November 30, 1927, two additional reels were ordered to be used in the experimental building on the west side by The Chicago Daily News at the same price as that specified in the contract. This order for two additional reels was accepted by the defendant to be billed separately when delivered and at the price stated in the contract. Under the agreement deliveries of reels were made as follows:

"It was then stipulated that Kohler delivered eight reels December, 1927, being four reels shipped December 1, 1927; four reels shipped December 12, 1927; four reels shipped September 1, 1928; four reels shipped September 29, 1928; four reels shipped October 6, 1928; four reels shipped October 19, 1928; five reels shipped December 1, 1928; five reels shipped December 3, 1928, making a total of thirty-eight reels." Four reels were shipped September 9, 1928 which by error was omitted in the above stipulation.

Under the same agreement payments were made by the plaintiff to the defendant, as follows:

"Check dated September 7, 1927 for $36,000, Plaintiff's Exhibit 1; check for $36,000, dated December 1, 1927, Plaintiff's Exhibit 2; check dated February 2,

1928 for $18,000, Plaintiff's Exhibit 3; check dated April 6, 1928, for $18,000, Plaintiff's Exhibit 4; check dated June 19, 1928 for $18,000, Plaintiff's Exhibit 5; check dated August 1, 1928 for $18,000, Plaintiff's Exhibit 6.''

The total payments made up to' and including August 1, 1928, were $144,000. The total number of reels delivered at any time was ·38. In the letter of July 27, 1927, accompanying the typewritten contract, after allowing credits and deductions, the net amount of that agreement was fixed at $180,000. This would make the cost of each reel $2,500, and from an examination of the number of reels delivered, as shown by the figures already stated and the amounts paid by the plaintiff, it is apparent that at this price per reel the defendant was paid a considerable amount over that required, at the time of the alleged breach of the contract for failure to deliver.

May 16, 1928, the plaintiff sent to the defendant the following communication:

''Referring to the contract between your company and this company dated July 27, 1927, covering seventy-two (72) Kohler magazine reels, later increased to seventy-four (74) reels, ten of which have been delivered. This company has made a change in design in its new presses which makes impossible the use of magazine reels. Consequently we hereby inform you that we will accept no more reels under said contract and we instruct you to deliver no more reels thereunder and to do no more work in the fabrication or preparation of said reels; and we hereby notify you that said contract is hereby finally cancelled and terminated by us.

''We shall be glad to discuss with you at your convenience the matter of fair reimbursement of such outlay, if any, already made in connection with this contract.''

From this communication it appears that at the time about 10 of the 74 reels had been delivered. In answer to this communication the defendant replied stating that the contract could not be canceled simply by sending notice thereof and adding,

"Relying on your contract, we have ordered all these reels and the principal parts of all of them have now been manufactured and we are in position to deliver them in accordance with the contract."

July 17, 1927, plaintiff wired defendant that it was willing to sell back the 64 reels then held by the defendant and not delivered. In answer to this telegram Kohler wired that under Clause Three of Specifications in the contract, defendant would, if possible, furnish any special apparatus requested and to send press drawings so that he could meet conditions and added in the telegram the following words:

"We are prepared to furnish the new device in your test plant to determine the necessary requirements and after tests are made to arrange for additional cost."

During the interim from the signing of the original agreement of July 27, 1927, until the letter of May 16, 1928, in which the plaintiff sought to terminate the contract for nondelivery, the plaintiff had installed new presses in its plant for the purpose of economizing space. It was found advisable under the circumstances to use a two-arm reel instead of the three-arm reel as was contemplated in the original agreement between the parties. Plans and drawings were prepared by the plaintiff and submitted to the defendant and evidently an attempt was made to prepare and manufacture a two-arm reel to take the place of the three-arm reel originally intended for the use in the plaintiff's plant. This two-arm reel was a fundamentally different piece of machinery from the original three-arm reel contracted for. Considerable testimony

was taken and written communications introduced in evidence pertaining to this innovation and the record is, consequently, in a somewhat confused state on this question. An analysis, however, of the evidence and testimony seems to bear out the position of plaintiff, namely, that the original agreement was not departed from even though it became apparent that the defendant would not be able to supply the new device.

The defendant in its plea of set-off insists that it refused to abide by the communication of May 16, 1928, in which the plaintiff attempted to rescind the agreement and charges that on July 30, 1928, the plaintiff formally notified the defendant that it would continue to perform its obligation under the contract dated July 27, 1927, and did thereafter make substantial payments to the defendant for reels received under that agreement. It is specifically charged by the defendant in its plea that ''defendant and plaintiff, although negotiating in regard to the terms of an agreement, under which defendant would undertake to design and construct such new and different device, no agreement was ever made therefor between defendant and plaintiff, and the original contract, with said modifications, remained in force and effect.''

July 30, 1928, the plaintiff mailed a check for $18,000, being 10 per cent due August 1, 1928, under contract dated July 27, 1927, together with a letter in which the plaintiff stated that the offer of May 16, 1928, to cancel the contract having been rejected by the defendant, it, the plaintiff, was ready to proceed with the original agreement. Among other things the letter contained the following, which in our opinion amounted to a recognition of the original agreement and a demand for delivery:

''We assume from your letter of May 16, 1928, answering our aforesaid letter of the same date, that these reels have now been manufactured in accord-

ance with the contract and that they will be ready for prompt delivery September 1, 1928. Please be advised that we expect and shall insist upon delivery of the 64 remaining reels promptly on September 1, 1928, as provided in the aforesaid letter of November 22, 1927, upon your stationery, signed by each of the parties to the contract."

August 6, 1928, Kohler wrote the Daily News in which he stated that he expected to deliver the 64 reels in accordance with the agreement and was using every effort to comply with the request. In this letter appears the following:

"In view of your letter, however, insisting upon delivery September 1st, we have ordered the shipment of these reels and they will be delivered to you at the earliest possible moment beginning on or about September 1, 1928."

From this time on the defendant in his communications to the plaintiff refers to the contract price as that of $4,000, for each reel. From a review of the evidence we are unable to ascertain upon what theory defendant bases this price. The plaintiff was still insisting upon shipment under the original agreement. Up to and including December 3, 1928, 38 reels had been delivered. Under the modification of the agreement of November 22, 1927, the entire shipment should have been completed by September 1, 1928. At this time the defendant had been paid in full for the reels shipped and had received an overpayment of $49,000. Upon the trial plaintiff credited the defendant with the sum of $300 derived from the sale of some of the old material as junk, leaving a balance due of $48,700 and this was the amount of the verdict.

After waiting for some time and not receiving deliveries under the original agreement, the Daily News wrote Kohler on January 26, 1929, as follows:

"We beg to advise you that in view of your continued failure to deliver the remaining reels, as pro-

vided by our contract, we do not intend to accept any further reels, and we shall bring suit against you for the damages caused by your failure to deliver, and for other damages caused by you in connection with this contract, and we have so instructed our attorneys.''

There appears to be one point on which both parties to this litigation agree and that is that the construction of the written contract of July 27, 1927, was one of law for the court. Cases are cited in support of this proposition and the defendant in its given instruction No. 14 told the jury that it was the duty of the court to construe the contract of purchase and the duty of the jury to accept that construction. The court accordingly instructed the jury in the language of the contract, together with the modification of November 22, 1927, and fixed the purchase price at $180,000, the net amount agreed upon in the undertaking. The instruction also directed the jury that under the agreement the 15 old reels were to become the property of Kohler and that the contract price agreed upon could not be affected by any disposition which The Chicago Daily News might see fit to make of reels delivered under the contract. We are of the opinion that this construction was substantially correct as given.

Great stress is laid upon the clause in the agreement to the effect that the reels were to be used in the plant of The Chicago Daily News. The exact wording, however, of the letter of July 27, 1927, which constituted part of the contract after fixing the net price, is as follows:

''This allowance is made because of the privilege extended to you in the agreement dated July 15, 1907, conceding your right to use these reels in the plant of The Chicago Daily News.'' It is stressed in the articles that the reels were patented articles and that the defendant had the right to limit their use. It is unques-

tionably the rule that the patentee has the right to enforce a limitation where the property is leased and the title remains in the vendor. Where, however, the patented article is sold the vendee obtains full control over the article and may sell or dispose of it as he sees fit and the vendor releases all right in the article in so far as its resale is concerned.

The Supreme Court announced the rule in the case of *United States v. General Electric Co.*, 272 U. S. 476, wherein it said: "Conveying less than title to the patent or part of it, the patentee may grant a license to make, use and vend articles under the specifications of his patent for any royalty or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure. It is well settled, as already said, that where a patentee makes the patented article and sells it, he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee's rights. *Adams v. Burke,* 17 Wall. 453; *Bloomer v. McQuewan,* 14. How. 539; *Mitchell v. Hawley,* 16 Wall. 544; *Hobbie v. Jennison,* 149 U. S. 355; *Keeler v. Standard Folding Bed Co.,* 157 U. S. 659." To the same effect see *Boston Store v. American Graphophone Co.,* 246 U. S. 8, wherein the Supreme Court in its opinion says:

"The case therefore directly involved the general question of the power of the patentee to sell, and yet, under the guise of license or otherwise, to put restrictions which in substance were repugnant to the rights which necessarily arose from the sale which was made. In other words, it required once again a consideration of the doctrine which had been previously announced in *Henry v. Dick Co.* and of the significance of the monopoly of the right to use conferred by the patent law which had been reserved in *Bauer v. O'Donnell.*

Comprehensively reviewing the subject, it was decided that the rulings in *Bauer v. O'Donnell* and *Straus v. Victor Talking Machine Co.* conflicted with the doctrine announced and the rights sustained in *Henry v. Dick Co.*, and that case was consequently overruled. Reiterating the ruling in the two last cases, it was again decided that as, by virtue of the patent law, one who had sold a patented machine and received the price, and had thus placed the machine so sold beyond the confines of the patent law, could not, by qualifying restrictions as to use, keep under the patent monopoly a subject to which the monopoly no longer applied.

"Applying the cases thus reviewed, there can be no doubt that the alleged price-fixing contract disclosed in the certificate was contrary to the general law and void. There can be equally no doubt that the power to make it in derogation of the general law was not within the monopoly conferred by the patent law, and that the attempt to enforce its apparent obligations under the guise of a patent infringement was not embraced within the remedies given for the protection of the rights which the patent law conferred."

The reference to use in the plant of The Chicago Daily News in our opinion was a matter of description and not of restriction. The plant of the defendant was located at Mishawaka, Indiana, and the designation for use in the plant of The Chicago Daily News may have been for shipping purposes, or it may have been for the purpose of showing the right which The Chicago Daily News had under its contract with the defendant of July 15, 1907. The operative part of the contract agreement between the parties was clear and unambiguous. The reference "for use in the plant of The Chicago Daily News" was a statement not necessary to a solution of the agreement between the parties. It was in the nature of a statement in a preamble. The

contract in question was one of bargain and sale and the terms of the agreement were governed by that part of the contract with reference thereto. *Martin v. Rothwell*, 81 W. Va. 681; *Hansbarger v. Hansbarger*, 206 Mich. 281; *Williams v. Barkley*, 165 N. Y. 48; *Irwin's Bank v. Fletcher Savings & Trust Co.*, 195 Ind. 669.

Upon the breach of the contract the plaintiff had the right to dispose of the property which it had purchased under the best circumstances that it could for the purpose of reducing its loss. Neither is it clear that the plaintiff used the machines in question in places other than the plant of The Chicago Daily News, or at least not until after repeated requests had been made for delivery. While there are numerous communications from the defendant regarding the contemplated new reels to be manufactured, it is apparent from a reading of this record that the plaintiff, after having attempted to alter the contract in order to meet conditions arising from the installation of the new presses, decided to continue it in force and demanded delivery and that the defendant even after May 16th promised to make deliveries in accordance with the agreement of July 27, 1927.

Some space is devoted by the defendant to error on the part of counsel for plaintiff in referring to the fact that Franklin Kohler, an heir, was not placed upon the stand by the defendant. This alleged error is based upon the fact that he was a party in interest and Kohler being dead he was not competent under the statute. We can see no force in this argument inasmuch as the defendant had the right to tender him as a witness and, moreover, such transactions as he might testify to might not have been matters concerning conversations in which the deceased participated. The contention is without merit.

Error is predicated upon the fact that counsel for the plaintiff in his address to the jury requested one

of their number, who happened to be a draftsman, to use his technical knowledge in examining certain drawings which were in evidence. No objection was taken to the remark at the time nor exception recorded. We see no reversible error in this contention.

It is also insisted that it was error to direct the attention of the jury to the fact that Kohler made a profit by not delivering the reels under the written agreement with the plaintiff. The fact is that the defendant filed a set-off and any testimony bearing on the question as to what he received for the sale of the reels was competent as bearing upon the question of his damages, if any.

Holden, a witness called by the defendant, on cross-examination testified that the amount received from the 34 reels not delivered to the Daily News was $135,110, and again stated that if he changed the price from $4,000 per reel to $2,500 the price set forth in the contract with The Chicago Daily News, the difference would be $111,000, so that instead of The Daily News owing Kohler $42,000, Kohler would owe The Daily News $68,955.12.

This evidence discussed by counsel for plaintiff in his argument was in the record and had a direct bearing on the question of defendant's set-off and also on the question as to whether or not Kohler had breached his contract with the plaintiff in good faith or whether he was tempted because of the additional profit derived from the sale of the reels to others.

We have considered the arguments of both counsel before the jury and find that there was constant interjections on both sides. The cause required a number of days in the trial. We find no such conduct on the part of counsel for the plaintiff as in our opinion should necessitate a retrial.

The question as to whether or not there was a breach in the contract by the defendant was one of fact; the jury was fully instructed and the theory of defendant

presented in full to the jury for its consideration. The verdict was sustained by the trial judge who heard the testimony and under the circumstances we find no reason for disturbing it.

For the reasons stated in this opinion the judgment of the circuit court is affirmed.

*Judgment affirmed.*

HALL, P. J., and HEBEL, J., concur.